# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

C.A. NUMBER:  05-11401-MLW

SENECA INSURANCE COMPANY
As Subrogee of Surfside Condominium
Association,

        Plaintiff,

v.

BROAN-NUTONE LLC,

        Defendant.

**AFFIDAVIT OF CHRISTOPHER A. DUGGAN IN SUPPORT OF MOTION OF
BROAN-NUTONE LLC FOR SUMMARY JUDGMENT**

I, Christopher A. Duggan, hereby depose and state as follows:

1.      This affidavit is made of my personal knowledge except as to those statements based on information and belief.

2.      I am an attorney with the law firm of Smith & Duggan LLP, Lincoln North, 55 Old Bedford Road, Lincoln, MA  01773, admitted to practice law before the courts of the Commonwealth and in good standing (BBO No. 544150).

3.      I am a counsel of record for Broan-NuTone LLC ("Broan"), a party to this matter.

4.      I submit this affidavit in support of (1) Defendant Broan-NuTone LLC's Motion for Summary Judgment and Request for Oral Argument ("Motion"), and (2) Defendant Broan-NuTone LLC's Memorandum and Local Rule 56.1 Statement in

Support of Motion for Summary Judgment and Request for Oral Argument

("Memorandum").

     5.      Attached at Tab A is a true and accurate copy of the Complaint.

     6.      Attached at Tab B is a true and accurate copy of the Yarmouth Fire

Department Report dated December 16, 2003.

     7.      Attached at Tab C is a true and accurate copy of portions of the transcript

of the deposition testimony of Wayne Levasseur taken on February 3, 2006 and relied

upon by Broan in its Motion and/or referred to by Broan in its Memorandum.

     8.      Attached at Tab D is a true and accurate copy of portions of the transcript

of the deposition testimony of Richard Vigeant taken on March 14, 2006 and relied upon

by Broan in its Motion and/or referred to by Broan in its Memorandum.

     9.      Attached at Tab E is a true and accurate copy of the December 29, 2003

Report from Engineering and Fire Investigations (EFI) to Seneca Insurance Company.

     10.      Attached at Tab F is a true and accurate copy of portions of the transcript

of the deposition testimony of Melissa Vieira taken on December 8, 2006 and relied upon

by Broan in its Motion and/or referred to by Broan in its Memorandum.

     11.      Attached at Tab G is a true and accurate copy of portions of the transcript

of the deposition testimony of Walter Becker taken on September 22, 2006 and relied

upon by Broan in its Motion and/or referred to by Broan in its Memorandum.

     12.      Attached at Tab H are true and accurate copies of records produced by

Whalen Restoration.

     13.      Attached at Tab I are true and accurate copies of records produced by

Seneca Insurance Company.

14.    Attached at Tab J is a true and accurate copy of the August 12, 2004 report from Industrial Services & Engineering, Inc. (ISE) to Wayne Levasseur.

15.    Attached at Tab K is a true and accurate copy of the Interrogatories of Broan-NuTone LLC to Plaintiff Seneca Insurance Company that were served on December 16, 2005. As of the date of this Affidavit, Seneca has not served answers to these interrogatories.

16.    Attached at Tab L are true and accurate copies of the Fed. R. Civ. P. 30(b)(6) notices that were served on Seneca. As of the date of this Affidavit, Seneca has not produced a witness in response to these notices.

17.    Attached at Tab M is a true and accurate copy of a December 16, 2003 *Cape Cod Times* article.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS 6th DAY OF FEBRUARY 2007.

*/s/ Christopher A. Duggan*
Christopher A. Duggan

## CERTIFICATE OF SERVICE

The undersigned certifies service of the foregoing on February 6, 2007 in accordance with Federal Rule of Civil Procedure 5(b)(2) and United States District Court for the District of Massachusetts Electronic Case Filing Administrative Procedure § E(2) as to all parties, having appeared in this action through counsel admitted to practice before this Court, identified by the Clerk as receiving Notice of Electronic Filing.

Counsel for Defendant BROAN-NUTONE LLC,

/s/ Christopher A. Duggan
Christopher A. Duggan
BBO No. 544150
SMITH & DUGGAN LLP
Lincoln North
55 Old Bedford Road
Lincoln, MA  01773-1125
(617) 228-4400

Dated: February 6, 2007

A

COUNTY CLERK'S OFFICE

NOT COMPARED
WITH COPY FILED

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

MAR 1 6 2005

----------------------------------------X   Date Filed:

SENECA INSURANCE COMPANY as
subrogee of SURFSIDE CONDOMINIUM
ASSOCIATION,

Index No. ~~~~~~
103660/05

                         Plaintiff,

COMPLAINT

    -against-

BROAN-NUTONE, LLC

                    Defendant.

----------------------------------------X

      Plaintiff, by its attorneys, Tese & Milner, as and for its Complaint herein,

respectfully sets forth and alleges as follows:

## FACTS COMMON TO ALL CAUSES OF ACTION

1.     That at all times hereinafter mentioned, the plaintiff SENECA INSRUANCE

COMPANY as subrogee of SURFSIDE CONDOMINIUM ASSOCIATION INC.

("Seneca" or "plaintiff"), was and is an insurance company duly organized under the laws

of the State of New York, engaged in the transaction of business in the State of New

York, with its principal place of business in New York, New York.

2.     That at all times hereinafter mentioned the subrogor SURFSIDE

CONDOMINIUM ASSOCIATION ("Surfside" or "subrogor") was and is a

Massachusetts Corporation engaged in the business of real property

ownership/management, with its principal place of business at 585 Main Street, West

Yarmouth, Massachusetts.

3.     That at all times hereinafter mentioned the defendant BROAN-NUTONE, LLC

("Broan" or "defendant") was and is a Delaware Limited Liability Company, registered

in the state of Wisconsin, with its principal place of business at 926 West State Street, Hartford, Wisconsin 53027.

4.    That at all times hereinafter mentioned, Defendant Broan was and is engaged in the business of manufacturing, selling, distributing and delivering electrical equipment, fans, exhaust fans and other electrical products, and more particularly a certain exhaust fan assembly known as a Broan-Nutone Exhaust Fan, model no. 657, built in 1997.

5.    That at all times hereinafter mentioned, Defendant Broan's products entered the stream of commerce in, among other places, the state of New York.

6.    Upon information and belief, prior to July 15, 2003, Defendant Broan, directly or through a distributor or agent, sold or delivered to Surfside, for good and valuable consideration, the Broan-Nutone Exhaust Fan, model no. 657.

7.    Upon information and belief, prior to July 15, 2003, Defendant Broan, its agents, servants and/or employees, designed and manufactured the Broan-Nutone Exhaust Fan bearing model no. 657 and filed and secured patents thereon.

8.    Prior to July 15, 2003, Defendant Broan sold and delivered its Broan-Nutone Exhaust Fan bearing model no. 657 to a retail outlet, to be used by the general public and more particularly, subrogor Surfside.

9.    Prior to July 15, 2003, the subrogor Surfside had installed, at its premises, the Broan-Nutone Exhaust Fan bearing model no. 657, for the use, need, purpose, and service of Surfside, its agents, servants, invitees and employees.

10.    On or about July 15, 2003, a fire occurred at the premises occupied by subrogor Surfside, which fire caused damage and harm to the subrogor's premises, property, equipment, inventory, goods and business.

2

11.    At the time of the fire, the Broan-Nutone Exhaust Fan at the subrogor's premises was being used for the purpose and in the manner normally intended.

12.    The Broan-Nutone Exhaust Fan was intended to and did reach subrogor Surfside without material modification.

13.    At all times mentioned herein, Plaintiff Seneca issued an insurance policy to plaintiff's subrogor Surfside insuring the premises against property damage and related expenses.

14.    Under the contract of insurance between Seneca and Surfside, Seneca was and is obligated to pay claims submitted for damage to the real and personal property at the premises.

15.    As a result of the July 15, 2003 fire, Plaintiff's subrogor Surfside sustained extensive financial damages for the cost of repair, replacement, cleaning services, etc.

16.    Subsequent to the July 15, 2003 fire, Plaintiff's subrogor Surfside made an insurance claim to Seneca for the damages caused to the premises at 585 Main Street, West Yarmouth, Massachusetts by the fire.

17.    Under the contract of insurance between Seneca and its subrogor Surfside, Seneca paid to Surfside the amount of $197,244.59 on the insurance claim submitted for damages to the real and personal property of Surfside, as a result of the damages caused by the fire on July 15, 2003.

18.    As a result of Seneca's payment to its subrogor, Seneca is subrogated to the extent of its payment, to the rights of its subrogor, as against all individuals, entities and corporations responsible for the loss and the resulting damage.

3

## AS AND FOR A FIRST CAUSE OF ACTION

19.   Plaintiff Seneca repeats and realleges each and every allegation contained in paragraphs 1 through 18 of this Complaint.

20.   On July 15, 2003, a fire occurred at the premises occupied by subrogor Surfside located at 585 Main Street, West Yarmouth, Massachusetts.

21.   The fire was due solely to the negligence of Defendant Broan, its agents, servants and/or employees in manufacturing, designing, selling, installing, dealing in and delivering the improper and defective Broan-Nutone Exhaust Fan, and manufacturing, designing, selling, installing, dealing in and delivering exhaust fans which were inherently dangerous. Defendant Broan was also negligent in failing to take proper precautions and safeguards, and failing to see that the exhaust fans were fit, proper and reasonably safe for the use for which they were intended. Defendant Broan negligently failed to provide exhaust fans of marketable quality, or to make proper tests and negligently failed to warn the general public and more particularly the subrogor herein and others of the dangers inherent in the use of its exhaust fans. Defendant Broan negligently failed to test the exhaust fans in conditions under which they were to be used. Defendant Broan negligently failed to provide proper safeguards for their exhaust fans, or have the exhaust fans equipped with proper fuses and/or internal thermal overload devices. Defendant Broan negligently manufactured, sold, installed, and distributed their exhaust fan in a careless, dangerous and improper manner with latent defects not observable to the user. Defendant Broan was negligent in failing to construct and install the exhaust fan in conformity with accepted standards, practices and procedures, in creating and maintaining a nuisance, trap or hazard, in failing to warn, caution or apprise

4

users of the exhaust fans and especially subrogor Surfside, of the dangers and hazardous conditions which resulted and which caused subrogor's injuries.

22.    As a result of the fire, Surfside sustained damage to its premises, property, goods, equipment and inventory in the amount of $197,244.59.

23.  .    By reason of the foregoing, Plaintiff demands recovery against the defendant Broan in an amount not less than $197,244.59.

## AS AND FOR A SECOND CAUSE OF ACTION

24.    Plaintiff Seneca repeats and realleges each and every allegation contained in paragraphs 1 through 23 of this Complaint.

25.    At all times stated herein, defendant Broan, its agents, servants and/or employees expressly and impliedly warranted to the general public and to the plaintiff's subrogor that the Broan-Nutone Exhaust Fan bearing model no. 657 was safe for the use intended.

26.    The plaintiff's subrogor replied upon the warranties both expressed and implied and used the exhaust fan.

27.    Upon information and belief, defendant, its agents, servants and/or employees breached the warranties. The Exhaust Fan was not fit for the purposes for which it was intended, was not of marketable quality, was unsafe for use, was of unsafe and defective design and dangerous, and contained latent defects.

28.    Plaintiff's subrogor had no knowledge of the falsity of the warrantees.

29.    On or about July 15, 2003, Surfside used the Broan-Nutone Exhaust Fan bearing model no. 657 at the premises it occupied at 585 Main Street, West Yarmouth, Massachusetts.

30.     Surfside relied upon the warranties and representations made by Broan and as a result of using the Broan-Nutone Exhaust Fan bearing model no. 657 suffered property damage.

31.     Surfside suffered damage which resulted from a fire on July 15, 2003 which fire was caused by the use of the Broan-Nutone Exhaust Fan bearing model no. 657.

32.     By reason of the foregoing breach of warranties and representations, Surfside sustained property damages in the amount of $197,244.59.

## AS AND FOR A THIRD CAUSE OF ACTION

33.     Plaintiff Seneca repeats and realleges each and every allegation contained in paragraphs 1 through 32 of this Complaint.

34.     Prior to July 15, 2003, the Broan-Nutone Exhaust Fan bearing model no. 657, manufactured by defendant Broan, was defectively designed and defective with respect to its mechanisms and appurtenances when it was shipped from the factory operated by Broan.

35.     This cause of action is instituted against the defendant under the doctrine of strict liability in tort.

36.     On or about July 15, 2003, Surfside was lawfully and properly using the Broan-Nutone Exhaust Fan bearing model no. 657 for the purpose and in the manner for which it was normally intended to be used.

37.     Use of the Broan-Nutone Exhaust Fan bearing model no. 657 caused the fire which resulted in damage to Surfside's property as alleged herein.

38.    Surfside did not discover the defect with respect to the design and manufacture of the Broan-Nutone Exhaust Fan bearing model no. 657, nor did Surfside perceive its danger.

39.    Surfside exercised reasonable care in the utilization of the exhaust fan and used it for the purpose for which it was intended.

40.    The defective design and the dangerous construction of the Broan-Nutone Exhaust Fan bearing model no. 657 was a substantial factor in causing the fire and the consequent damages to Surfside and its property.

41.    As a result of the fire, Surfside sustained damages in the amount of $197,244.59.


WHEREFORE, Plaintiff Seneca demands judgment against defendant Broan on all causes of action for an amount not less than $197,244.59 and for such other and further relief as this Court deems just and proper.


Dated: New York, New York
     March 16, 2005

                    Yours etc.

                    MICHAEL M. MILNER
                    Tese & Milner
                    Attorneys for Plaintiff
                    One Minetta Lane
                    New York, New York 10012
                    (212) 475-3673

**B**

**A**

| 01351 | MM DD YYYY | | | NFIRS -1 |
|---|---|---|---|---|
| FDID ★ State ★ | 12 15 2003 | 03 0005134 000 | ☐ No Activity | Basic |
| | Incident Date ★ | Station Incident Number ★ Exposure ★ | ☐ Change | |

**B** Location★

☐ Check this box to indicate that the address for this incident is provided on the Wildland Fire Module in Section B "Alternative Location Specification". Use only for Wildland fires.

Census Tract [____] - [____]

☒ Street address
☐ Intersection
☐ In front of
☐ Rear of
☐ Adjacent to
☐ Directions

| 589 | | ROUTE 28 | | |
|---|---|---|---|---|
| Number/Milepost | Prefix | Street or Highway | Street Type | Suffix |

Apt./Suite/Room [____]

| West Yarmouth | | MA | 02673 |
|---|---|---|---|
| City | | State | Zip Code |

Cross street or directions, as applicable

**C** Incident Type ★

| 111 | Building fire |
|---|---|
| Incident Type | |

**D** Aid Given or Received ★

1 ☒ Mutual aid received
2 ☐ Automatic aid recv.
3 ☐ Mutual aid given
4 ☐ Automatic aid given
5 ☐ Other aid given
N ☐ None

| 01922 | |
|---|---|
| Their FDID | Their State |

[____] Their Incident Number

**E1** Date & Times        Midnight is 0000

Check boxes if dates are the same as Alarm Date.

| | | Month | Day | Year | Hr Min Sec |
|---|---|---|---|---|---|
| | Alarm ★ ALARM always required | 12 | 15 | 2003 | 14:07:00 |
| ☒ | Arrival ★ ARRIVAL required, unless canceled or did not arrive | 12 | 15 | 2003 | 14:11:00 |
| ☐ | Controlled CONTROLLED Optional, Except for wildland fires | | | | |
| ☒ | Last Unit Cleared LAST UNIT CLEARED, required except for wildland fires | 12 | 15 | 2003 | 16:34:00 |

**E2** Shift & Alarms      Local Option

| C | | |
|---|---|---|
| Shift or Platoon | Alarms | District |

**E3** Special Studies      Local Option

| | |
|---|---|
| Special Study ID# | Special Study Value |

**F** Actions Taken ★

| 11 | Extinguish |
|---|---|
| Primary Action Taken (1) | |

| 12 | Salvage overhaul |
|---|---|
| Additional Action Taken (2) | |

[____] [_____]
Additional Action Taken (3)

**G1** Resources ★

☒ Check this box and skip this section if an Apparatus or Personnel form is used.

| | Apparatus | Personnel |
|---|---|---|
| Suppression | 0007 | 0039 |
| EMS | | |
| Other | | |

☐ Check box if resource counts include aid received resources.

**G2** Estimated Dollar Losses & Values

LOSSES: Required for all fires if known. Optional for non fires.

| | | | | None |
|---|---|---|---|---|
| Property $ | [____] , | 000 , | 000 | ☐ |
| Contents $ | [____] , | 000 , | 000 | ☐ |

PRE-INCIDENT VALUE: Optional

| Property $ | [____] , | 000 , | 000 | ☐ |
| Contents $ | [____] , | 000 , | 000 | ☐ |

**Completed Modules**

☒ Fire-2
☒ Structure-3
☐ Civil Fire Cas.-4
☐ Fire Serv. Cas.-5
☐ EMS-6
☐ HazMat-7
☐ Wildland Fire-8
☒ Apparatus-9
☒ Personnel-10
☐ Arson-11

**H1**★ Casualties ☐ None

| | Deaths | Injuries |
|---|---|---|
| Fire Service | | |
| Civilian | | |

**H2** Detector

Required for Confined Fires.

1 ☐ Detector alerted occupants
2 ☐ Detector did not alert them
U ☐ Unknown

**H3** Hazardous Materials Release

N ☐ None
1 ☐ Natural Gas: slow leak, no evacuation or HazMat actions
2 ☐ Propane gas: <21 lb. tank (as in home BBQ grill)
3 ☐ Gasoline: vehicle fuel tank or portable container
4 ☐ Kerosene: fuel burning equipment or portable storage
5 ☐ Diesel fuel/fuel oil: vehicle fuel tank or portable
6 ☐ Household solvents: home/office spill, cleanup only
7 ☐ Motor oil: from engine or portable container
8 ☐ Paint: from paint cans totaling < 55 gallons
0 ☐ Other: Special HazMat actions required or spill > 55gal., please complete the HazMat form

**I** Mixed Use Property

NN ☐ Not Mixed
10 ☐ Assembly use
20 ☐ Education use
33 ☐ Medical use
40 ☐ Residential use
51 ☐ Row of stores
53 ☐ Enclosed mall
58 ☐ Bus. & Residential
59 ☐ Office use
60 ☐ Industrial use
63 ☐ Military use
65 ☐ Farm use
00 ☐ Other mixed use

**J** Property Use★      Structures

131 ☐ Church, place of worship
161 ☐ Restaurant or cafeteria
162 ☐ Bar/Tavern or nightclub
213 ☐ Elementary school or kindergarten
215 ☐ High school or junior high
241 ☐ College, adult education
311 ☐ Care facility for the aged
331 ☐ Hospital

Outside

124 ☐ Playground or park
655 ☐ Crops or orchard
669 ☐ Forest (timberland)
807 ☐ Outdoor storage area
919 ☐ Dump or sanitary landfill
931 ☐ Open land or field

341 ☐ Clinic,clinic type infirmary
342 ☐ Doctor/dentist office
361 ☐ Prison or jail, not juvenile
419 ☐ 1-or 2-family dwelling
429 ☐ Multi-family dwelling
439 ☐ Rooming/boarding house
449 ☐ Commercial hotel or motel
459 ☐ Residential, board and care
464 ☐ Dormitory/barracks
519 ☐ Food and beverage sales

936 ☐ Vacant lot
938 ☐ Graded/care for plot of land
946 ☐ Lake, river, stream
951 ☐ Railroad right of way
960 ☐ Other street
961 ☐ Highway/divided highway
962 ☐ Residential street/driveway

539 ☐ Household goods,sales,repairs
579 ☐ Motor vehicle/boat sales/repair
571 ☐ Gas or service station
599 ☐ Business office
615 ☐ Electric generating plant
629 ☐ Laboratory/science lab
700 ☐ Manufacturing plant
819 ☐ Livestock/poultry storage(barn)
882 ☐ Non-residential parking garage
891 ☐ Warehouse

981 ☐ Construction site
984 ☐ Industrial plant yard

Lookup and enter a Property Use code only if you have NOT checked a Property Use box:

Property Use [ 580 ]

General retail, Other

NFIRS-1 Revision 03/11/99

Yarmouth Fire Department

01351        12/15/2003        03-0005134

## K1 Person/Entity Involved

Local Option

Business name (if applicable)

Area Code    Phone Number

☐ Check This Box if same address as incident location. Then skip the three duplicate address lines.

Mr.,Ms., Mrs.  First Name: RICHARD

MI

Last Name: VIGEANT

Suffix

Number: 1022    Prefix    Street or Highway: MAIN

ST
Street Type

Suffix

Post Office Box

Apt./Suite/Room

City: West Barnstable

State: MA    Zip Code: 02668  -

☐ **More people involved? Check this box and attach Supplemental Forms (NFIRS-1S) as necessary**

## K2 Owner  ☐ Same as person involved? Then check this box and skip The rest of this section.

Local Option

Business name (if Applicable): BLYTH INDUSTRIES

203 - 661 - 0196
Area Code    Phone Number

☐ Check this box if same address as incident location. Then skip the three duplicate address lines.

Mr.,Ms., Mrs.  First Name: WALTER

MI

Last Name: BECKER

Suffix

Number: 1    Prefix: E    Street or Highway: WEAVER

ST
Street Type

Suffix

Post Office Box

Apt./Suite/Room

City: GREENWICH

State: CT    Zip Code  -

## L  Remarks

Local Option

CALLED BY BUILDING OCCUPANT REPORTING FIRE IN BATHROOM AT COLONIAL CANDLE (RECIEVED TELEPHONE NOTIFICATION APPROX. 1MINUTE LATER OF AFA FROM CENTRAL STATION)  UPON ARRIVAL NOTED MODERATE SMOKE FROM SIDE 3 (C) VENTALATION FAN AND THROUGH ROOF STACKS. ADVANCED DRY 1 3/4 HANDLINE TO 2ND FLOOR OFFICE AREA. DISCHARGED 5LB DRY EXTINGUISER THROUGH BATHROOM VENT FAN THEN OPERATED HANDLINE THROUGH CEILING KNOCKING DOWN MOST OF FIRE.  EXTENSIVE OVERHAUL REQUIRED TO OPEN CEILINGS AND CHASE FIRE THROUGH ATTIC SPACE.  EXTERIOR ROOF OPEN IN SEVERAL PLACES.

ELECTRICAL AND BUILDING INSPECTORS CALLED TO SCENE.  CAUSE DETERMINED TO BE EXCESSIVE HEET FROM BATHROOM VENTALATION FAN (POSSIBLY SEIZED) IN CLOSE PROXIMITY TO STRUCTURAL COMPONENTS.

## L  Authorization

| Officer in charge ID | Signature | Position or rank | Assignment | Month | Day | Year |
|---|---|---|---|---|---|---|
| 110 | Bowles, Alan T | CAPP | | 12 | 16 | 2003 |

Check Box if ☒ same as Officer in charge.

Member making report ID: 110    Signature: Bowles, Alan T    Position or rank: CAPP    Assignment    Month: 12  Day: 16  Year: 2003

Yarmouth Fire Department

01351    12/15/2003    03-0005134

**A**

| 01351 | MM DD YYYY 2003 | 3 | 03-0005134 | 000 | ☐ Change |
|---|---|---|---|---|---|
| FDID ★ | State ★   Incident Date ★ | Station | Incident Number ★ | Exposure ★ | ☐ No Activity |

NFIRS -2
Fire

---

**B  Property Details**

**B1**
[X] Not Residential

_____ Not Residential

_Estimated Number of residential living units in building of origin whether or not all units became involved_

**B2**
| 001 | ☐ Buildings not involved |

Number of buildings involved

**B3**
| | [X] None |

Acres burned
(outside fires)   ☐ Less than one acre

---

**C  On-Site Materials** ☐ None
or Products

Complete if there were any significant amounts of commercial, industrial, energy or agricultural products or materials on the Property, whether or not they became involved

Enter up to three codes. Check one or more boxes for each code entered.

| 950 | Mixed sales |
On-site material (1)

1 ☐ Bulk storage or warehousing
2 ☐ Processing or manufacturing
3 [X] Packaged goods for sale
4 ☐ Repair or service

| | |
On-site material (2)

1 ☐ Bulk storage or warehousing
2 ☐ Processing or manufacturing
3 ☐ Packaged goods for sale
4 ☐ Repair or service

| | |
On-site material (3)

1 ☐ Bulk storage or warehousing
2 ☐ Processing or manufacturing
3 ☐ Packaged goods for sale
4 ☐ Repair or service

---

**D  Ignition**

**D1** | 25 | Bathroom, checkroom,
Area of fire origin ★

**D2** | 10 | Heat from powered
Heat source ★

**D3** | 17 | Structural member or
Item first ignited ★   1 ☐ Check Box if fire spread was confined to object of origin

**D4** | 65 | Fiberboard,
Type of material first ignited   Required only if item first ignited code is 00 or <70

---

**E1   Cause of Ignition**

☐ Check box if this is an exposure report. Skip to section G

1 ☐ Intentional
2 ☐ Unintentional
3 [X] Failure of equipment or heat source
4 ☐ Act of nature
5 ☐ Cause under investigation
U ☐ Cause undetermined after investigation

**E2  Factors Contributing To Ignition**

| 30 | Electrical | ☐ None |
Factor Contributing To Ignition (1)

| | |
Factor Contributing To Ignition (2)

---

**E3  Human Factors**
Contributing To Ignition

Check all applicable boxes

1 ☐ Asleep                          ☐ None
2 ☐ Possibly impaired by alcohol or drugs
3 ☐ Unattended person
4 ☐ Possibly mental disabled
5 ☐ Physically Disabled
6 ☐ Multiple persons involved

7 ☐ Age was a factor
Estimated age of
person envolved | |

1 ☐ Male        2 ☐ Female

---

**F1  Equipment Involved In Ignition**

☐ None If Equipment was not involved, Skip to Section G

| | |
Equipment Involved

Brand | |

Model | |

Serial # | |

Year | |

**F2  Equipment Power**

| | |
Equipment Power Source

**F3  Equipment Portability**

1 ☐ Portable
2 ☐ Stationary

Portable equipment normally can be moved by one person, is designed to be use in multiple locations, and requires no tools to install.

**G  Fire Suppression Factors**

Enter up to three codes. ☐ None

| 100 | Building |
Fire suppression factor (1)

| | |
Fire suppression factor (2)

| | |
Fire suppression factor (3)

---

**H1  Mobile Property Involved**

☐ None

1 ☐ Not involved in ignition, but burned
2 ☐ Involved in ignition, but did not burn
3 ☐ Involved in ignition and burned

**H2  Mobile Property Type & Make**

| | |
Mobile property type

| | |
Mobile property make

| | |
Mobile property model                       | | Year

| | | | |
License Plate Number        State   VIN Number

**Local Use**

☐ Pre-Fire Plan Available
Some of the information presented in this report may be based upon reports from other Agencies

☐ Arson report attached
☐ Police report attached
☐ Coroner report attached
☐ Other reports attached

NFIRS-2 Revision 01/19/99

---

Yarmouth Fire Department

01351     12/15/2003     03-0005134

## I₁ Structure Type *
If fire was in a closed building or a portable/mobile structure complete the rest of this form

1 [X] Enclosed Building
2 [ ] Portable/mobile structure
3 [ ] Open structure
4 [ ] Air supported structure
5 [ ] Tent
6 [ ] Open platform (e.g. piers)
7 [ ] Underground structure (work areas)
8 [ ] Connective structure (e.g. fences)
0 [ ] Other type of structure

## I₂ Building Status *

1 [ ] Under construction
2 [X] Occupied & operating
3 [ ] Idle, not routinely used
4 [ ] Under major renovation
5 [ ] Vacant and secured
6 [ ] Vacant and unsecured
7 [ ] Being demolished
0 [ ] Other
U [ ] Undetermined

## I₃ Building Height
Count the ROOF as part of the highest story

`002`
Total number of stories at or above grade

Total number of stories below grade

## I₄ Main Floor Size *

`, 004 , 800`
Total square feet

**OR**

`, 060 BY , 080`
Lenght in feet / Width in feet

**NFIRS-3 Structure Fire**

## J₁ Fire Origin *

`002` [ ] Below Grade
Story of fire origin

## J₂ Fire Spread *

1 [ ] Confined to object of origin
2 [ ] Confined to room of origin
3 [X] Confined to floor of origin
4 [ ] Confined to building of origin
5 [ ] Beyond building of origin

## J₃ Number of Stories Damaged By Flame
Count the ROOF as part of the highest story

Number of stories w/ minor damage (1 to 24% flame damage)

`001` Number of stories w/ significant damage (25 to 49% flame damage)

Number of stories w/ heavy damage (50 to 74% flame damage)

Number of stories w/ extreme damage (75 to 100% flame damage)

## K Material Contributing Most To Flame Spread

[ ] Check if no flame spread OR same as material first ignited OR unable to determine

**Skip To Section L**

### K₁ `10` | Structural component or
Item contributing most to flame spread

### K₂ `63` | Sawn wood, including
Type of material contributing most of flame spread / Required only if item contributing code is 00 or<70

## L₁ Presence of Detectors *
(In area of the fire)

N [ ] None Present — Skip to section M

1 [X] Present

U [ ] Undetermined

## L₂ Detector Type

1 [ ] Smoke
2 [X] Heat
3 [ ] Combination smoke - heat
4 [ ] Sprinkler, water flow detection
5 [ ] More than 1 type present
0 [ ] Other _____
U [ ] Undetermined

## L₃ Detector Power Supply

1 [ ] Battery only
2 [ ] Hardwire only
3 [ ] Plug in
4 [ ] Hardwire with battery
5 [ ] Plug in with battery
6 [ ] Mechanical
7 [ ] Multple detectors & power supplies
0 [ ] Other
U [X] Undetermined

## L₄ Detector Operation

1 [ ] Fire too small to activate
2 [X] Operated (Complete Section L5)
3 [ ] Failed to Operate (Complete Section L6)
U [ ] Undetermined

## L₅ Detector Effectiveness
Required if detector operated

1 [ ] Alerted Occupants, occupants responded
2 [ ] Occupants failed to respond
3 [ ] There were no occupants
4 [X] Failed to alert occupants
U [ ] Undetermined

## L₆ Detector Failure Reason
Required if detector failed to operate

1 [ ] Power failure, shutoff or disconnect
2 [ ] Improper installation or placement
3 [ ] Defective
4 [ ] Lack of maintenance, includes cleaning
5 [ ] Battery missing or disconnected
6 [ ] Battery discharged or dead
0 [ ] Other _____
U [ ] Undetermined

## M₁ Presence of Automatic Extinguishment System *

N [X] None Present
1 [ ] Present — Complete rest of Section M

## M₂ Type of Automatic Extinguishment System *
Required if fire was within designed range of AES

1 [ ] Wet pipe sprinkler
2 [ ] Dry pipe sprinkler
3 [ ] Other sprinkler system
4 [ ] Dry chemical system
5 [ ] Foam system
6 [ ] Halogen type system
7 [ ] Carbon dioxide ($CO_2$) system
0 [ ] Other special hazard system
U [ ] Undetermined

## M₃ Automatic Extinguishment System Operation
Required if fire was within designed range

1 [ ] Operated & effective (Go to M4)
2 [ ] Operated & not effective (M4)
3 [ ] Fire too small to activate
4 [ ] Failed to operate (Go to M5)
0 [ ] Other
U [ ] Undetermined

## M₄ Number of Sprinkler Heads Operating
Required if system operated

Number of sprinkler heads operating

## M₅ Automatic Extinguishment System Failure Reason
Required if system failed

1 [ ] System shut off
2 [ ] Not enough agent discharged
3 [ ] Agent discharged but did not reach fire
4 [ ] Wrong type of system
5 [ ] Fire not in area protected
6 [ ] System components damaged
7 [ ] Lack of maintenance
8 [ ] Manual Intervention
0 [ ] Other _____
U [ ] Undetermined

NFIRS-3 Revision 01/19/99

| A | | | | | | NFIRS – 9 |
|---|---|---|---|---|---|---|
| | | MM | DD | YYYY | | Apparatus or |
| 01351 | MA | 12 | 15 | 2003 | 3 | 03-0005134 | 000 | | Resources |
| FDID ★ | State ★ | Incident Date ★ | | | Station | Incident Number ★ | Exposure ★ | ☐ Change |

**B**

| Apparatus or ★ Resource | Date and Times (Check if same as alarm date) | | | | | Sent ☒ | Number of ★ People (Check ONE box for each apparatus to indicate its main use at the incident.) | Use | Actions Taken |
|---|---|---|---|---|---|---|---|---|---|
| | | Month | Day | Year | Hour Min | | | | |

| **1** ID 41  Type 12 | Dispatch ☒ | 12 | 15 | 2003 | 14:07 | ☒ | 2 | ☒ Suppression  ☐ EMS  ☐ Other | ⌐ ⌐ |
| | Arrival ☒ | 12 | 15 | 2003 | 14:13 | | | | |
| | Clear ☒ | 12 | 15 | 2003 | 16:28 | | | | |

| **2** ID 42  Type 11 | Dispatch ☒ | 12 | 15 | 2003 | 14:07 | ☒ | 4 | ☒ Suppression  ☐ EMS  ☐ Other | ⌐ ⌐ |
| | Arrival ☒ | 12 | 15 | 2003 | 14:15 | | | | |
| | Clear ☒ | 12 | 15 | 2003 | 16:58 | | | | |

| **3** ID 43  Type 11 | Dispatch ☒ | 12 | 15 | 2003 | 14:07 | ☒ | 4 | ☒ Suppression  ☐ EMS  ☐ Other | ⌐ ⌐ |
| | Arrival ☒ | 12 | 15 | 2003 | 14:11 | | | | |
| | Clear ☒ | 12 | 15 | 2003 | 16:53 | | | | |

| **4** ID 46  Type 60 | Dispatch ☒ | 12 | 15 | 2003 | 14:07 | ☒ | 2 | ☒ Suppression  ☐ EMS  ☐ Other | ⌐ ⌐ |
| | Arrival ☒ | 12 | 15 | 2003 | 14:51 | | | | |
| | Clear ☒ | 12 | 15 | 2003 | 16:30 | | | | |

| **5** ID 47  Type 11 | Dispatch ☒ | 12 | 15 | 2003 | 14:07 | ☒ | 4 | ☒ Suppression  ☐ EMS  ☐ Other | ⌐ ⌐ |
| | Arrival ☒ | 12 | 15 | 2003 | 14:16 | | | | |
| | Clear ☒ | 12 | 15 | 2003 | 16:25 | | | | |

| **6** ID 48  Type 11 | Dispatch ☒ | 12 | 15 | 2003 | 14:07 | ☒ | 2 | ☒ Suppression  ☐ EMS  ☐ Other | ⌐ ⌐ |
| | Arrival ☒ | 12 | 15 | 2003 | 14:24 | | | | |
| | Clear ☐ | 12 | 15 | 2003 | 16:26 | | | | |

| **7** ID 52  Type 92 | Dispatch ☒ | 12 | 15 | 2003 | 14:07 | ☒ | 1 | ☒ Suppression  ☐ EMS  ☐ Other | ⌐ ⌐ |
| | Arrival ☒ | 12 | 15 | 2003 | 14:11 | | | | |
| | Clear ☒ | 12 | 15 | 2003 | 16:20 | | | | |

| **8** ID   Type | Dispatch ☐ | | | | | ☐ | | ☐ Suppression  ☐ EMS  ☐ Other | ⌐ ⌐ |
| | Arrival ☐ | | | | | | | | |
| | Clear ☐ | | | | | | | | |

| **9** ID   Type | Dispatch ☐ | | | | | ☐ | | ☐ Suppression  ☐ EMS  ☐ Other | ⌐ ⌐ |
| | Arrival ☐ | | | | | | | | |
| | Clear ☐ | | | | | | | | |

**Type of Apparatus or Resources**

**Ground Fire Suppression**
11 Engine
12 Truck or aerial
13 Quint
14 Tanker & pumper combination
16 Brush truck
17 ARF (Aircraft Rescue and Firefighting)
10 Ground fire suppression, other

**Heavy Ground Equipment**
21 Dozer or plow
22 Tractor
24 Tanker or tender
20 Heavy equipment, other

**Aircraft**
41 Aircraft: fixed wing tanker
42 Helitanker
43 Helicopter
40 Aircraft, other

**Marine Equipment**
51 Fire boat with pump
52 Boat, no pump
50 Marine apparatus, other

**Support Equipment**
61 Breathing apparatus support
62 Light and air unit
60 Support apparatus, other

**Medical & Rescue**
71 Rescue unit
72 Urban Search & rescue unit
73 High angle rescue unit
75 BLS unit
76 ALS unit
70 Medical and rescue unit, other

**More Apparatus? Use Additional Sheets**

**Other**
91 Mobile command post
92 Chief officer car
93 HazMat unit
94 Type 1 hand crew
95 Type 2 hand crew
99 Privately owned vehicle
00 Other apparatus/resource

NN None
UU Undetermined

NFIRS-9 Revision 11/17/98

| A | | | | | | | | | NFIRS - 10 |
|---|---|---|---|---|---|---|---|---|---|
| 01351 | MA | 12 | 15 | 2003 | 3 | 03-0005134 | 000 | ☐ Delete | Personnel |
| FDYD ★ | State ★ | MM DD YYYY Incident Date ★ | | | Station | Incident Number ★ | Exposure ★ | ☐ Change | |

| A | 01351 | MA | MM 12 | DD 15 | YYYY 2003 | 3 | 03-000513 | 000 | ☐ Delete | NFIRS - 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| | FDID ★ | State ★ | Incident Date ★ | | | Station | Incident Number ★ | Exposure ★ | ☐ Change | Personnel |

| B Apparatus or ★ Resource | Date and Times | Sent | Number of People ★ | Use | Actions Taken |
|---|---|---|---|---|---|

**B — Apparatus or Resource**

Use codes listed below

Date and Times — Check if same as alarm date — Month Day Year — Hours/mins

Use — Check ONE box for each apparatus to indicate its main use at the incident.

Actions Taken — List up to 4 actions for each apparatus and each personnel.

---

**[1]** ID 41    Type 12

| | Month | Day | Year | Hours/mins |
|---|---|---|---|---|
| Dispatch ☒ | 12 | 15 | 2003 | 14:07 |
| Arrival ☒ | 12 | 15 | 2003 | 14:13 |
| Clear ☒ | 12 | 15 | 2003 | 16:28 |

Sent ☒    Number of People: 2

Use: ☒ Suppression ☐ EMS ☐ Other

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 137 | Sawyer, Jonathan | FFE | X | | | | |
| 142 | Bearse, Matthew | FFP | X | | | | |

---

**[2]** ID 42    Type 11

| | Month | Day | Year | Hours/mins |
|---|---|---|---|---|
| Dispatch ☒ | 12 | 15 | 2003 | 14:07 |
| Arrival ☒ | 12 | 15 | 2003 | 14:15 |
| Clear ☒ | 12 | 15 | 2003 | 16:58 |

Sent ☒    Number of People: 4

Use: ☒ Suppression ☐ EMS ☐ Other

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 104 | Kittila, Robert | LT | X | | | | |
| 138 | Omerzu, Marc | FFE | X | | | | |
| 157 | Almonte, Gregg | FFE | X | | | | |
| 159 | Cronin, Robert | FFP | X | | | | |

---

**[3]** ID 43    Type 11

| | Month | Day | Year | Hours/mins |
|---|---|---|---|---|
| Dispatch ☒ | 12 | 15 | 2003 | 14:07 |
| Arrival ☒ | 12 | 15 | 2003 | 14:11 |
| Clear ☒ | 12 | 15 | 2003 | 16:53 |

Sent ☒    Number of People: 4

Use: ☒ Suppression ☐ EMS ☐ Other

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 103 | Schauwecker, Daniel | FF | X | | | | |
| 110 | Bowles, Alan | CAPP | X | | | | |
| 130 | Foley, Mark | SP | X | | | | |
| 136 | Mullen, Joseph | FFP | X | | | | |

---

Yarmouth Fire Department

NFIRS-10 Revision 11/17/98

01351     12/15/2003     03-0005134

| A | | | | | | | |
|---|---|---|---|---|---|---|---|
| 01351 | MA | 12 15 2003 | 3 | 03-000513 | 000 | ☐ Delete | NFIRS – 10 Personnel |
| FDID ★ | State ★ | Incident Date ★ | Station | Incident Number ★ | Exposure ★ | ☐ Change | |

**B**

| Apparatus or Resource ★ Use codes listed below | Date and Times — Check if same as alarm date — Month Day Year Hours/mins | Sent | Number of People ★ | Use — Check ONE box for each apparatus to indicate its main use at the incident. | Actions Taken — List up to 4 actions for each apparatus and each personnel. |
|---|---|---|---|---|---|

| 1 | ID 46 | Type 60 | Dispatch ☒ 12 15 2003 14:07 | Arrival ☒ 12 15 2003 14:51 | Clear ☒ 12 15 2003 16:30 | Sent ☒ | 2 | ☒ Suppression ☐ EMS ☐ Other |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 113 | Falletti, Steven | FFP | X | | | | |
| 145 | Napolitan, Ronald | FFE | X | | | | |

| 2 | ID 47 | Type 11 | Dispatch ☒ 12 15 2003 14:07 | Arrival ☒ 12 15 2003 14:16 | Clear ☒ 12 15 2003 16:25 | Sent ☒ | 4 | ☒ Suppression ☐ EMS ☐ Other |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 118 | Holmquist, Paul | FFP | X | | | | |
| 123 | Christensen, Robb | FFE | X | | | | |
| 139 | Huck, Kevin | FFP | X | | | | |
| 144 | Enright, Kevin | FFE | X | | | | |

| 3 | ID 48 | Type 11 | Dispatch ☒ 12 15 2003 14:07 | Arrival ☒ 12 15 2003 14:24 | Clear ☒ 12 15 2003 16:26 | Sent ☒ | 2 | ☒ Suppression ☐ EMS ☐ Other |

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 146 | Foss, Jeffrey | FFE | X | | | | |
| 94 | Bent, Allen | CAP | X | | | | |

| A | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 01351 | MM 15 DD | YYYY 2003 | 3 | 03-000513 | 000 | ☐ Delete | NFIRS - 10 | |
| FDID ✱ | State ✱  Incident Date ✱ | | Station | Incident Number ✱ | Exposure ✱ | ☐ Change | Personnel | |

| B  Apparatus or ✱ Resource | Date and Times | Sent | Number of ✱ People | Use | Actions Taken |
|---|---|---|---|---|---|
| Use codes listed below | Check if same as alarm date | ☒ | | Check ONE box for each apparatus to indicate its main use at the incident. | List up to 4 actions for each apparatus and each personnel. |

**[1]**  ID `52`   Type `92`

| | Month | Day | Year | Hours/mins |
|---|---|---|---|---|
| Dispatch ☒ | 12 | 15 | 2003 | 14:07 |
| Arrival ☒ | 12 | 15 | 2003 | 14:11 |
| Clear ☒ | 12 | 15 | 2003 | 16:20 |

Sent ☒   Number 1

☒ Suppression
☐ EMS
☐ Other

Actions Taken: ☐ ☐ / ☐ ☐

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| 96 | Sherman, C. Randall | C1 | X | | | | |

**[2]**  ID ____   Type ____

| | | | | |
|---|---|---|---|---|
| Dispatch ☐ | | | | |
| Arrival ☐ | | | | |
| Clear ☐ | | | | |

Sent ☐

☐ Suppression
☐ EMS
☐ Other

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |

**[3]**  ID ____   Type ____

| | | | | |
|---|---|---|---|---|
| Dispatch ☐ | | | | |
| Arrival ☐ | | | | |
| Clear ☐ | | | | |

Sent ☐

☐ Suppression
☐ EMS
☐ Other

| Personnel ID | Name | Rank or Grade | Attend ☒ | Action Taken | Action Taken | Action Taken | Action Taken |
|---|---|---|---|---|---|---|---|
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |
| | | | ☐ | | | | |

Yarmouth Fire Department

**NFIRS-10 Revision 11/17/98**
01351    12/15/2003    03-0005134

C

ORIGINAL

Volume 1, Pages 1 - 93

Exhibits:  1 - 4

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------

SENECA INSURANCE COMPANY

as Subrogee of Surfside

Condominium Association,

                    Plaintiff

vs.                         Docket No. 05-11401-MLW

BROAN-NUTONE LLC,

                    Defendant

------------------------

RECORD DEPOSITION OF LUCIER CLAIM SERVICE

by its Designee, WAYNE LEVASSEUR,

and DEPOSITION OF WAYNE LEVASSEUR, Individually

Friday, February 3, 2006, 3:00 p.m.

Smith & Duggan LLP

55 Old Bedford Road

Lincoln, Massachusetts

--------- Janis T. Young, RDR, CRR ---------

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404  Fax 617-728-4403

15

1     A.   I believe it was the following day -- yes,

2  yes, I was.

3     Q.   Right.

4     A.   Yes, I was.

5     Q.   The fire started, it was on the 13th?

6     A.   I'm sorry; yes, that's correct.  You said

7  the fire; I was thinking of my contact.  That's

8  correct.

9     Q.   Had the fire scene been altered at all in

10  the day and a half or two days between the fire and

11  when you arrived, as far as you know?

12            MR. PAPADOPOULOS:  Objection.

13            MR. FIELD:  Objection.

14            Go ahead; you can answer the question.

15     A.   Not that I was aware of.

16     Q.   Before you got there, did you talk to

17  anybody from Seneca Insurance Company?

18     A.   I do not recall.  I don't think I did, but

19  I don't recall.

20     Q.   Did you ever talk to anyone from Seneca

21  Insurance Company about this fire?

22     A.   Before the inspection?

23     Q.   At any time.

24     A.   Yes.

16

1      Q.   Who did you talk to?

2      A.   I believe it was Donna Moore, but I'm not

3  sure.  It could have been Del -- D'Allessandro I

4  believe it is, I believe it is; but I'm not

5  positive.

6          I usually, on a fire this size, call --

7  and I know I did while I was there -- just to make

8  sure they wanted to get somebody down there to take

9  a look at it because of the size of the fire.  Not

10  because there was suspicion; just, the amount of

11  damage, we would recommend they call and have

12  somebody come in, a cause-and-origin expert.

13      Q.   Before you went, you did not call somebody

14  from Seneca; is that true?

15      A.   I don't think so, no.

16      Q.   You made the call after you got to the

17  scene?

18      A.   That's correct.

19      Q.   And you talked to either Ms. Moore or

20  Mr. D'Allesandro?

21      A.   That's correct.

22      Q.   And what did you say to either of them, and

23  what did they say to you?

24      A.   I really don't recall.

FARMER ARSENAULT BROCK LLC

27

1    Q.    So he may or may not have said --

2    A.    I did have a phone conversation with him

3    the day prior to.  In my phone conversation, I'm

4    sure, and I don't recall word for word, but asked

5    him specifics about the fire.

6    Q.    During that phone conversation, in general

7    terms, can you tell me what he told you about the

8    cause of the fire?

9            MR. FIELD:  Objection.

10   A.    I really don't recall.

11   Q.    Did he say anything about what he thought

12   caused the fire?

13           MR. FIELD:  Objection.

14   A.    I don't recall.

15   Q.    Do you remember at some point that the

16   insured told you he thought the fire started in a

17   bathroom fan?

18           MR. FIELD:  Objection.

19   A.    I don't recall.

20   Q.    Anyway, "During our inspection" -- I'm

21   going back to the question I asked you -- "we found

22   a fire had started in the second-floor bathroom

23   ceiling.  It appeared that the fire started in or

24   around an exhaust fan/light unit."

28

1          Did you call Ms. Moore or

2  Mr. D'Allesandro after your initial inspection on

3  the 17th and tell them what you found?

4     A.   Yes.

5     Q.   Before you wrote this report?

6     A.   That's correct.

7     Q.   Was it on that same day or the day after?

8     A.   I believe it was when I left the loss

9  location.

10    Q.   When you left the loss location on December

11 17 of 2003, what did you say to either Ms. Moore or

12 Mr. D'Allesandro, and what did they say to you,

13 about your findings as to where the fire started?

14          MR. FIELD:  Objection.

15    A.   I don't recall.

16    Q.   In any event, you told them your

17 conclusion, anyway, that the fire had started in or

18 around the bathroom ceiling fan?

19          MR. FIELD:  Objection.

20    A.   Not necessarily that day.

21    Q.   Did you say anything on that day about

22 where you thought the fire had started?

23    A.   No -- I might have said the second-floor

24 bathroom.

FARMER ARSENAULT BROCK LLC

38

1   I've driven by there, but I haven't been back inside

2   the building.

3        Q.   Have you spoken to Mr. Vegent at all?

4        A.   No, I have not.

5        Q.   Have you spoken to any of the owners or

6   employees of Colonial Candle?

7        A.   No, I have not.

8        Q.   You mentioned earlier in the deposition

9   that you weren't sure that the building was ever

10  repaired.  What led you to that conclusion?

11       A.   I've driven by there.  I know the roof

12  hasn't been repaired.  I've driven by there; it

13  looks just like this as of last week, the roof.

14       Q.   Looks like what's shown on the first

15  photograph of the EFI photos dated -- what are they

16  dated?

17       A.   This patch is still there.  I saw that last

18  week.  And if that's still there, that means they

19  didn't do the rafters.

20       Q.   That's right; okay.

21            Going back to your report, there's a

22  section on your initial report dated January 2, '04

23  that's headlined Subrogation.

24       A.   That's correct.

FARMER ARSENAULT BROCK LLC

39

1    Q.    Why is this here?

2    A.    That's just a standard caption that we put

3    on our reports.

4    Q.    That's done in the ordinary course of your

5    business as an independent adjuster?

6    A.    That's on every report we send out.

7    Q.    What does it mean?  What's it there for?

8    A.    Subrogation is to let the carrier know if

9    we feel there's subrogation potential.

10    Q.    In other words, someone they can get their

11    money back from?

12    A.    I guess I'd have to ask you to rephrase

13    that question.

14    Q.    Someone they can present a claim to to try

15    to get their money back from once they pay out the

16    insured on the loss?

17    A.    You mean the insurance company?

18    Q.    Yes.

19    A.    That's correct.

20    Q.    That's what subrogation is?

21    A.    Yes.

22    Q.    So what the companies ask you to do, Seneca

23    and others, is to tell them whether you think

24    there's a claim worth investigating against some

FARMER ARSENAULT BROCK LLC

40

1   other company that may have caused this fire, for

2   example?

3       A.   Well, in most cases, in nearly all cases,

4   we don't make that decision as adjusters.  I'm there

5   to adjust the damage.  We recommend that they call

6   in a cause-and-origin expert to take a look and tell

7   them if there's subrogation potential, and that's

8   what we'd normally put in that paragraph.

9       Q.   That's what you in fact did put in there?

10      A.   That's correct.

11      Q.   That's what you were asked to do?

12      A.   What I was asked to do.

13      Q.   And that's what Seneca wanted?

14      A.   That's correct.

15      Q.   Is there some practice, or do you have some

16  practice of letting the insurance company know as

17  soon as possible whether or not there's a potential

18  subrogation claim?

19      A.   That's correct.

20      Q.   Why?

21      A.   Well, in this case, as I mentioned before,

22  the size of the fire -- and I had no intention of

23  meaning somebody was responsible for this fire when

24  I first called them, meaning just because of the

41

1    size of the fire, the amount of damage, for them, to

2    give them the opportunity to investigate in case

3    there would be subrogation potential.

4        Q.   And it's important to have the evidence as

5    preserved as much as possible so that all the

6    evidence can be viewed, right?

7                MR. FIELD:  Objection.

8        A.   That's -- I mean, I'm not there to look at

9    the cause and origin.  That is an accurate

10   statement, I would say.

11       Q.   And that's what you do for all of your

12   clients?

13       A.   That's correct.

14       Q.   Make sure that they are aware, and have the

15   best opportunity possible to evaluate the evidence

16   as soon as possible?

17       A.   That's correct.

18       Q.   So you wrote in your report of January 2 of

19   2004, two weeks after the fire, that "As you are

20   aware, EFI, Engineer and Fire Investigations, was

21   called and has submitted their initial report,"

22   correct?

23       A.   Yes.

24       Q.   So as of January 2 of 2004, two weeks after

FARMER ARSENAULT BROCK LLC

42

1  this fire, with the fire scene not significantly

2  altered, Seneca already had a cause-and-origin

3  person on the site, right?

4      A.   That's correct.

5      Q.   In fact, they had already submitted a

6  report to them?

7      A.   That's correct.

8      Q.   And that report told them they thought this

9  fire started in or around the bathroom fan?

10          MR. FIELD:  Objection.

11     A.   That's correct.

12     Q.   Did you learn of any reason why Seneca

13  didn't tell Broan-NuTone about this fire until three

14  years later?

15          MR. FIELD:  Objection.

16          MR. PAPADOPOULOS:  Objection.

17     A.   I do not.

18     Q.   Now, you go on to say, "It appears this

19  fire started in the second-floor bathroom around the

20  light fixture."  The fan/light fixture, right?

21     A.   Around where it was, or could have been.  I

22  don't know if it was even there.

23     Q.   And you say, "It appears the fixture is six

24  to seven years old."  What led you to that belief?

FARMER ARSENAULT BROCK LLC

48

1    Q.    Called EFI?

2    A.    That's correct.

3    Q.    Have you worked with EFI, or had you worked

4  with EFI before?

5    A.    Just on a couple claims.

6    Q.    Are they local?

7    A.    I believe they have an office in New

8  Bedford, and they service the Cape.

9    Q.    Was that a call that you made, do you know?

10   A.    Yes.  I believe I called Randy Lucier --

11 his expertise is much more than me -- and I asked

12 him, who would we use in this particular case, and

13 he mentioned EFI.

14   Q.    And then did you call EFI?

15   A.    That's correct; I believe from my cell

16 phone.

17   Q.    Did you make that phone call before your

18 January 2 report?

19   A.    Oh, yes.  I called him, I believe, right

20 away, the day after the fire or the day of the fire,

21 could have been.

22   Q.    Who did you speak to at EFI?

23   A.    I believe it was the secretary, whoever

24 answered the phone, told them, gave them the policy

FARMER ARSENAULT BROCK LLC

58

1    switch?

2            MR. FIELD:  Objection.

3        A.  I don't recall.

4        Q.  Did you discuss this meter with Mr. Lowe at

5    all?

6            MR. PAPADOPOULOS:  Objection.

7        A.  Not that I can recall.

8        Q.  The reason I ask is, this is from your

9    file, Mr. Lowe's report?

10       A.  That's correct.

11       Q.  And over on Page 4 -- did you read the

12   report over?

13       A.  Yes, I did.

14       Q.  And you notice that on Page 4, Mr. Lowe

15   reports a conversation that he had with Mr. Wayne

16   Johnson.

17       A.  That's correct.

18       Q.  Do you know Mr. Johnson?

19       A.  No, I don't.

20       Q.  Mr. Johnson apparently is an employee or

21   manager of Colonial Candle, according to --

22       A.  That's what the report says, yes.

23       Q.  And Mr. Johnson said that the timer, switch

24   timer, would not work.

62

1    A.    That's right, because they're looking into

2    the cause and origin, and they're going to, I

3    believe, interview the fire chief and whoever was

4    there.

5    Q.    Do you know if the cause-and-origin person,

6    Mr. Lowe, did any of that?

7    A.    I do not know if he did.

8    Q.    Anyway, looking at the fire report that's

9    in your file, under Box K, it says, "Owner, Blythe

10   Industries."  Do you know what that means?

11   A.    No, I don't know.

12   Q.    Because my understanding is, this was owned

13   by Surfside Condominium.

14   A.    That's what I was made aware of, yes.

15   Q.    You have no idea what Blythe --

16   A.    No.

17   Q.    Any idea who Walter Becker is?

18   A.    No, I don't.

19   Q.    Do you know anything about Colonial Candle

20   as a business?

21        MR. FIELD:  Objection.

22   A.    No, I don't.

23   Q.    Had you ever been in the store before the

24   fire?

70

1    Q.   Or for subrogation purposes, anything like

2    that?

3    A.   No, it did not.

4    Q.   When you went back the first time, were the

5    fans still in the cathedral ceiling room on the

6    floor?

7    A.   I don't believe I went up there.

8    Q.   How about the second time?

9         MR. PAPADOPOULOS:  Are we talking about

10   the first time that he went there, the second time

11   that he went there, or the first time --

12   A.   You mean after January 2, correct?

13   Q.   Of course.

14        MR. PAPADOPOULOS:  Objection.

15   A.   And I believe it was three times I went

16   back:  twice with Whalen, and then I went back, and

17   it's in the file; it was much later.  I'm the one

18   who brought the fans to -- yes, it could have been

19   then; that's correct.  After 6-25, that's correct; I

20   brought the fans to Industrial Services Engineering.

21   Q.   As reflected, you have a report to Lucier

22   dated 6-25-04, correct?

23   A.   That's correct.

24   Q.   And on the second page, again under the

71

1    heading subrogation, you state, quote, "As discussed

2    with your office, we picked up both second-floor

3    bathroom fixtures, removed them from the area of

4    origin," right?

5        A.    That's correct.

6        Q.    When you talk about the area of origin,

7    you're just talking about the building?

8        A.    That's right.  They were in the next --

9    they weren't far from the bathrooms.  You know, from

10   that wall, maybe 15, 16 feet away.

11       Q.    They were still on the floor in the

12   cathedral ceiling room?

13       A.    They were still in the same place that I

14   can recall as they were originally.

15       Q.    Had they been altered at all?

16             MR. FIELD:  Objection.

17       A.    I did not inspect them.

18       Q.    Could you tell one way or another whether

19   anything had been changed in either one of those

20   products?

21             MR. PAPADOPOULOS:  Objection.

22       A.    Could I?

23       Q.    Yes.

24       A.    No, I could not.

72

1     Q.   The reason I ask is now we're almost seven

2  months after the fire, right?

3     A.   That's correct.

4     Q.   And they've been sitting on the floor, as

5  far as you know, in there for seven months?

6     A.   That's correct.

7     Q.   Do you know if anyone had looked at them

8  other than Mr. Lowe or Mr. Zarek?

9     A.   I do not know.

10     Q.   Do you know if anyone had altered them in

11  any way?

12     A.   I do not know.

13     Q.   Do you know if that switch, by the way, was

14  still there on June 24, 2005?

15     A.   I don't know.

16     Q.   Do you know if anyone made any effort to

17  preserve any of the wires in either of the

18  bathrooms?

19     A.   I do not know.

20     Q.   Or to trace any of the wires?

21     A.   I do not know.

22     Q.   Or to preserve the switch box, the circuit

23  breaker panel?

24     A.   I do not know.

FARMER ARSENAULT BROCK LLC

**D**

ORIGINAL

1

Volume 1, Pages 1-81, Exhibits 1-6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11401-MLW

SENECA INSURANCE COMPANY

    as Subrogee of Surfside Condominium Associates

    Plaintiff

    v.

BROAN-NUTONE LLC

    Defendant


DEPOSITION of RICHARD C. VIGEANT

Tuesday, March 14, 2006, 10:19 AM to 12:12 PM

Smith and Duggan LLP

Lincoln North, Third Floor

55 Old Bedford Road

Lincoln, Massachusetts


----------JONATHAN H. YOUNG, RDR/CRR----------

FARMER ARSENAULT BROCK LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404    Fax 617.728.4403

www.fabreporters.com

38

1     A.   Two years ago, initially.

2     Q.   That would have been...

3     A.   Shortly after the fire, once the insurance

4  company was satisfied.

5           I was contemplating at the time

6  renovating the building, and I hired him at that

7  time.  We didn't go ahead with that.  And then

8  ultimately, he did it now.  So there was a

9  delay there of a year, give or take.

10    Q.   When were the structures in the bathroom

11  taken down?

12    A.   Perhaps two months ago.

13    Q.   What about the wiring in the bathroom?

14    A.   That too.

15    Q.   That's all gone now too?

16    A.   Yes.

17    Q.   Did anyone from the insurance company ask

18  you to preserve any of that?

19          MR. PAPADOPOULOS:  Objection.

20    A.   I assumed that the insurance company

21  probably would want to evaluate that, and for this

22  reason I put aside the unit that ultimately caused

23  the fire.

24          How do we know that?  It was severely

39

1    burnt.  The other one was hardly touched; it was

2    just blackened.

3            I put it aside.  I brought that to the

4    attention of the appraiser, and it was there for his

5    or some evaluation by the insurance company at their

6    pleasure.  It is no longer available.

7            It was left quite a period of time, if I

8    had to guess I would say probably a month or more,

9    so that whoever wanted to examine it could do so.

10    Q.   Was the manufacturer of the fan given

11    notice of the fire at that time, so they could come

12    and examine it?

13            MR. PAPADOPOULOS:  Objection.

14    A.   Not to my knowledge.

15    Q.   What about the internal wiring from the

16    switch up to the fan unit?  Was that preserved?

17            MR. PAPADOPOULOS:  Objection.

18    A.   What was the question?

19    Q.   There was a wall switch, was there not,

20    that controlled the operation of the fan and the

21    light?

22    A.   Yes.

23    Q.   And to connect the fan to the wall switch,

24    there was wiring; correct?

40

1      A.   Yes.

2      Q.   Was the wiring from the wall switch to the

3  fan preserved?

4      A.   I believe so, until the area was completely

5  renovated several months ago, when just about all of

6  the partitions on the second floor were removed, as

7  well as wiring and sheetrock and whatever.

8           It's broom-clean now, and the space is

9  essentially open.  No partitions any longer.

10     Q.   The wall switch, sir, there was a timer on

11 that wall switch, was there not?

12     A.   I don't recall.

13     Q.   Do you know if that wall switch, or if

14 there was a timer the timer, if that was

15 preserved?

16     A.   No, I don't recall.

17     Q.   Did anybody ask you to preserve it?

18     A.   No.

19     Q.   Now, there was overcurrent protection, I

20 take it, in the building; right?

21          MR. FIELD:  Objection.

22     A.   Overcurrent protection?

23     Q.   Yes.

24     A.   You mean circuit breakers?

45

1    A.    The origin of the fire was obviously

2    discussed, because the bathrooms were trashed.

3    It was pretty obvious that it initiated from the

4    ceiling fixture.

5              So this was more than a passing

6    interest, obviously.  That's the reason for my

7    setting this aside, or otherwise it might have

8    gotten thrown out along with everything else.

9              Beyond that, I don't know.  I don't know

10   if he ultimately took it or not.  I know we had it

11   set aside for a long period of time, and I don't

12   know if he took the unit or not.

13   Q.    I meant to ask you, sir, do you know if

14   there was insulation on the ceiling above the fan?

15   A.    Yes.  I know that there was insulation.

16   Q.    What kind of insulation was that?

17   A.    It's a composite.  I can't remember the

18   name of it.  You don't see it very often.  I don't

19   know what it was.  It's a white material that was

20   essentially put on, and the roofing would be put on

21   top of that.

22             There was quite a bit of it in the

23   forward part of the office, forward part of the

24   floor.

52

1          MR. DUGGAN:  I don't have any other

2   questions for you, sir.  Thank you very much for

3   your time.

4          THE WITNESS:  You're welcome.

5          MR. FIELD:  I just have a few; just a

6   few.

7          EXAMINATION

8   BY MR. FIELD:

9      Q.   Mr. Vigeant, you testified to Mr. Duggan

10  that you removed the unit from the ceiling and you

11  placed it on the floor?

12     A.   No, I didn't say I removed it.  I simply

13  said I put the unit aside for the insurance

14  company or whoever wished to examine it.

15     Q.   Let me ask you.  Did you remove it from the

16  ceiling?

17     A.   No.

18     Q.   Where did you find it?

19     A.   It was in the debris where the bathrooms

20  had been badly burned.

21     Q.   On the floor?

22     A.   I believe so.

23     Q.   And you saw it there?

24     A.   I believe so.

53

1     Q.    And you picked it up, I take it?

2     A.    Yes, put it in a box and put it aside, and

3    let the powers that be know that we had it; and that

4    was the extent of my involvement with the fan.

5     Q.    Now, you testified in response to Mr.

6    Duggan's question about what you observed in the

7    ceiling that you saw composite insulation.

8     A.    Yes.

9     Q.    How did you observe that?  Did you get up

10   with a ladder?

11    A.    No.  It was visible.  You could see that.

12   The units that were finished, certain sections of

13   it, at least the ones in the front of the building,

14   that would be facing Route 28, where most of the

15   damage originated, you could see panels, very much

16   like ceiling panels, but they're insulating panels.

17    Q.    It's like a drywall; it's a board?

18    A.    It's a board.  It's a fire-resistant board.

19   It's got a name.  I can't recall what it is.

20    Q.    And usually it's tacked onto the...

21    A.    It's not on the drywall so much as the

22   rafters.  That's where I observed it, in any event.

23    Q.    And you observed that there was charring on

24   the board?  What did you observe about the charring?

**E**



**EFI®**

Engineering and Fire
Investigations

634 State Road, Suite K
North Dartmouth, MA 02747
800-326-5811
Tel: 508-997-4900
Fax: 508-991-8824
www.efiglobal.com

*All sent
to Co
1/6/04*

# FIRE INVESTIGATION
## Report One and Final

**EXHIBIT**
2-3-06
3-C
LEVASSEUR

| | |
|---|---|
| **Insured:** | **Surfside Condo Association** |
| **Loss Location:** | **West Yarmouth, Massachusetts** |
| **Date of Loss:** | **December 15, 2003** |
| **Policy No.:** | **Unknown** |
| **Claim No.:** | **3LLN065** |
| **EFI File No.:** | **94507-01565** |

**Report Date:**    December 29, 2003

**Prepared For:**    Seneca Insurance Company
160 Water Street
New York, NY 10038

**Attention:**    Ms. Donna Moore

*THIS REPORT FURNISHED AS PRIVILEGED AND CONFIDENTIAL TO ADDRESSEE. RELEASE TO ANY OTHER COMPANY, CONCERN, OR INDIVIDUAL IS SOLELY THE RESPONSIBILITY OF ADDRESSEE*

94507-01565                    December 29, 2003                    Page 1
Insured:  Surfside Condo Association

ASSIGNMENT

The assignment was received on December 17, 2003, with instructions to conduct an origin and
cause investigation on a fire that occurred at 585 Main Street, West Yarmouth, Massachusetts on
December 15, 2003.

ENCLOSURES

1.  Property Description Form.

2.  Photographs (31).

3.  Additional Materials Envelope that contains photographs and negatives.

FIRE SCENE EXAMINATION

The fire scene examination was completed on December 18, 2003.  Individuals present during
the inspection were public adjuster Greg Boyd, partial building owner and co-owner Dick Regent
as well as the employees and owners of Colonial Candle Company.

Conditions affecting the overall fire scene examination were normal salvage and overhaul
operations as completed by the Yarmouth Fire Department, as well as a municipal fire scene
examination.  Both ceiling light fixtures/fans from the second floor men's and ladies' room had
been pulled down prior to this inspection.  They remained on-site and were available for
inspection and therefore did not impede my ability to determine the origin and cause of this fire.
Most of the circuit breakers had been placed in the off position or reset by an electrician after the
fire installing temporary lighting.

The fire scene examination began with an inspection of the exterior surrounding grounds and
building.  This revealed that the hole that had been cut in the roof by firefighters had been
repaired.  No other exterior damage was observed.  Security of the building is not at issue in this
investigation as Colonial Candle was open for business when this fire occurred.

The interior fire scene examination then commenced beginning at the area of least damage, and
progressing to the area of most severe.  I noted that neither the heating system nor the electric
service entrance and meter socket were involved with the cause of this fire.  I also examined the
second floor electrical distribution panel, which was also undamaged.  The main utility
appliances were not involved with the cause of this fire.  The components of the individual
branch circuits will be addressed later in this report.

The first floor was only residually damaged by soot.  There was no evidence of fire origin at this
location.

94507-01565                    December 29, 2003                                        Page 2
Insured: Surfside Condo Association

I ascended to the second floor of Colonial Candle.  In a conference room at the left front corner there was damage at ceiling level and in the roof construction above.  This damage progressed in a diagonal fashion from the lower roofline towards the rear of the building.  This indicated that the fire communicated from that direction.

In the second floor office at the rear of the Colonial Candle occupancy, similar burning and charring was observed in the roof construction.  This damage was the greatest at and adjacent to the void spaces that surrounded and that were above the men's and ladies' room.  The men's and ladies' rooms were located on the extreme center left side of the second floor.

I examined the hallway outside and adjacent to the two bathrooms.  Smoke and heat damage was observed throughout.  All indications were that the products of combustion communicated from the area of the bathrooms.

I first inspected the second floor men's bathroom.  There was minimal damage within the actual bathroom.  In the void space above the ceiling, significant heavy char and burning was observed. The burn patterns were directional in nature, indicating that the fire communicated from above the ladies' room.  Further, the slope of the roof and roof rafters extended in a downward direction towards the ladies' room.  The center rafter channel extending out of the ladies' room was severely burned and charred.  The fire traveled up this rafter channel from above the ladies' room.

I closely examined the second floor ladies' bathroom.  I noted that the switch for the ceiling fan/light fixture was in the on position.  It was a timer style switch that was set at about 27 minutes as of the date of this inspection.

Inside the ladies' room there was minimal damage except from that debris that had collapsed from the ceiling.  The fire damage occurred above the ceiling level and was limited to the single roof rafter channel directly above where the ceiling fan/light fixture was located.  The charring extended down the rafter channel to the exact position of where this fan was located.  The fan itself had been removed by public sector investigators prior to this inspection.

Where the fan/light fixture was mounted to the joist, moderate to deep charring occurred.  The inner portion of the rafters were charred in a direction towards the fan/light fixture.  The burn patterns were very clear and specific, indicating that this fire had its origin at this fixture.

The electrical wiring that led to the fixture was closely examined.  Some of the insulation had burned from the conductors.  Closer inspection revealed no evidence of excessive arcing or short-circuiting on the wires that remained in the ceiling at the time of this inspection.

I then proceeded to examine the two ceiling light fixtures/fan motors that were located in the men's room and ladies' room.  A circular type of light fixture was located above the men's room

94507-01565                    December 29, 2003                    Page 3
Insured: Surfside Condo Association

ceiling and a rectangular style was the one that was in the ladies' room. Both fixtures had been pulled down by local fire investigating authorities.

The circular fixture from the men's room was examined. It was severely oxidized, discolored and burned. The incandescent bulb in the fixture still remained intact. The exterior housing was severely burned and discolored. However, the burn patterns indicated that the fire did not have its origin at this fan/light fixture.

The rectangular fixture from the ladies' room ceiling was next examined. Its internal fan motor was severely discolored and oxidized due to intense heat levels. The bulb in the light fixture had been broken during this incident and I was unable to determine its wattage. The exterior housing was severely burned and discolored on one side with much lesser damage on the opposite side.

The less damaged side was most likely positioned in the direction towards the lower end of the direction of the roofline. This was away from the damage. The most severe damage in the rafter channel was at the center and towards the peak of the roofline. This explains that the center portion and peak side of the fixture was most damaged.

The rectangular light fixture/fan motor was in no way dismantled or altered. It is in the possession of the Colonial Candle Corporation as they completed a build out on the second floor in 1997 at which time they partitioned in the two bathrooms and installed appropriate wiring and fixtures. I do not feel that this evidence is the property of the Surfside Condominium Association. Officials from Colonial Candle agreed to preserve both light fixtures and the switch for the ladies' room fan until such time as it can be turned over to the appropriate insurance representative.

## INVESTIGATION

I spoke with Dick Regent who identified himself as one of the trustees for the Surfside Condominium Association. They lease the area where the fire originated to the Colonial Candle Corporation. Colonial Candle has been there since 1997.

Mr. Regent stated that when Colonial Candle moved in there was no second floor men's or ladies' rooms. Colonial Candle opted at that time to complete a build out on the second floor in order to install a conference room, two bathrooms and an office area. This build out was done at Colonial Candle's expense. At that time, they installed two new bathrooms and put in appropriate electrical wiring and fixtures in both.

Mr. Regent stated that there have been no electrical problems in the building that he is aware of. There has been no recent maintenance or construction. There have been no leaks in the roof that he is aware of as well.

94507-01565                    December 29, 2003                    Page 4
Insured: Surfside Condo Association

I spoke with Wayne Johnson who identified himself as one of the managers for Colonial Candle Corporation. He confirmed the information regarding the 1997 build out. This was done completely at the direction and at the expense of Colonial Candle.

Mr. Johnson stated that he did not know the exact age and did not know the manufacturer of the two ceiling fan/light fixtures that were in the second floor bathrooms. They were installed in and around the time that they completed their 1997 build out. He did not know the manufacturer of the ceiling fan/light fixtures in the second floor bathrooms. They were not giving them any trouble whatsoever.

Mr. Johnson stated that the only thing that was slightly a problem is the timer that operated the ladies' room lights/fan. The timer would not work. They would need to turn the switch on and then manually turn it to off. It would not automatically shut off via the timer.

I have spoken to Mabel Mel and Melissa Hayes. Mabel believes she was in the ladies' bathroom on the second floor sometime just prior to lunch. She took lunch at 12:30 p.m. She did use the light and she believes that she shut it off.

Melissa Hayes stated that she was in the ladies' bathroom between 10:30 and 11:00 p.m. She was sure that she shut off the light at that time. She reiterated that the timer would not work and she would have to manually turn it off. She does not know if someone else went into the bathroom after her.

I have spoken to all of the employees who worked for Colonial Candle that day. The last person that I can identify as being in the ladies' room was Melissa Hayes between 12:30 and 1:00 p.m. I have been unable to locate anyone who was in the bathroom after Ms. Hayes.

The Falmouth Fire Department, Fire Prevention Bureau has listed this fire as accidental and related to the ceiling fan/fixture in the ladies' room.

DETERMINATION OF ORIGIN AND CAUSE

The origin of this fire has been determined to be in the second floor ladies' room ceiling. The origin has more specifically been determined to be directly at the ceiling fan/light fixture.

The cause of this fire has been determined to be an electrical malfunction in the ceiling fan/light fixture. The exact malfunction is currently undetermined.

RECOMMENDATIONS AND/OR COMMENTS

Adjuster Wayne Levasseur of Lucier Adjustment has been advised of the status of this investigation. At his direction, no further investigative activities will be needed at this time.

94507-01565                    December 29, 2003                    Page 5
Insured: Surfside Condo Association


Should further investigation be desired, a qualified electrical engineer can analyze the light fixture from the second floor ladies' room in an effort to ascertain its exact malfunction. This fan/light fixture is currently being held by the management of Colonial Candle Corporation.



                                                      JEFFREY K. LOWE
                                                         Investigator
                                                        508-886-2043

File Closed

JKL/lpm

Enclosures

cc: Richard D. Dietzman
    Vice President Northeast

94507-01565                    December 29, 2003                              Page 6
Insured:  Surfside Condo Association

## PHOTO DESCRIPTION

1.  Front view of the building.

2.  The ceiling above the conference room.

3.  The ceiling above the office.

4.  The hallway on the second floor.

5.  The men's room.

6.  The men's room ceiling.

7.  The men's room ceiling.

8.  The men's room ceiling.

9.  The attic and void space above the bathrooms.

10. The rafter channel extending downward towards the area above the ladies' room.

11. The small partition wall separating the men's room void space from the ladies' room void space.

12. The door entering the ladies' room.

13. Switch for the fan/light fixture in the ladies' room.

14. Timer switch for the fan/light fixture in the ladies' room.

15. The ladies' room.

16. The ceiling in the ladies' room.

17. The ceiling in the ladies' room and the center rafter channel.

18. The center rafter channel directly where the fan/light fixture was located.

19. The wiring and joist immediately adjacent to where the fan/fixture was located.

20. The charring on the joist and roof deck directly where the fan was located.

21. The fan/light fixtures from both bathrooms.

94507-01565                December 29, 2003                    Page 7
Insured: Surfside Condo Association

22. The fixture from the men's room.

23. Some wood from the men's fixture.

24. The bulb for the men's light fixture.

25. The side view of the men's light fixture/fan.

26. The bottom of the men's room fan/fixture.

27. The fan/fixture from the ladies' room.

28. The bulb for the ladies' room light.

29. The lesser burned side of the fixture from the ladies' room.

30. The lesser burned side of the fixture from the ladies' room.

31. The bottom and more severely burned side of the fixture from the ladies' room.

32. The wiring leading into the fixture from the ladies' room.

33. The wiring leading into the fixture from the ladies' room.

Enclosure  1



**EFI**

Engineering and Fire
Investigations

## Property Description

Insured  Surfside Condominium Association    EFI No.  94507-01565
Street  585 Main Street    City  West Yarmouth    State  MA
Occupancy  ☐ Dwelling  ☒ Business  ☐ Unoccupied  ☐ Other
☒ Owner Occupied    ☒ Tenant occupied    Approximate age  _____ years
Building construction  ☒ Wood  ☐ Masonry  ☐ Metal  ☐ Other
Roofing material  ☒ Composition material  ☐ Metal  ☐ Tile  ☐ Wood
☐ Tar and gravel  ☐ Other
Number of stories  2    Number of rooms  _____    Number of baths  _____
Foundation  ☐ Basement  ☒ Concrete slab  ☐ Pier and beam  ☐ Crawl space
Heating  ☒ Natural gas  ☐ Propane gas  ☐ Electric  ☒ Other  Fuel Oil
Air conditioning  ☐ Natural gas  ☐ Propane gas  ☐ Electric  ☐ Other
Electrical service connected during fire  ☒ Yes  ☐ No  ☐ Unknown
Alarm system  ☒ Yes  ☐ No    Type  Smoke    ☒ Local  ☐ Monitored
Garage  ☒ None  ☐ Attached  ☐ Detached    Approximate size
Outbuildings on premises  ☐ Yes  ☒ No  ☐ Damaged  ☐ Undamaged
Outside conditions  ☒ Normal  ☐ Unkempt  ☐ Well groomed  ☐ Other
General conditions  ☐ Excellent  ☒ Average  ☐ Poor  ☐ Other
Fire protection  ☐ Unknown  ☐ Volunteer  ☒ Paid  ☐ Paid &  Volunteer
Department  Yarmouth Fire Department    Distance to Station
Completed during examination  ☒ Diagram  ☐ Video  ☒ Photographs
☐ Measurements  ☒ Interviews
Date examination began  12/18/03    Date examination completed  12/18/03



F

ORIGINAL

1

Volume 1 Pages 1-78

Exhibits 1-4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

*************************************************

SENECA INSURANCE COMPANY as Subrogree

of Surfside Condominium Association,

        Plaintiff

vs.                Docket No. 05-11401-MLW

BROAN-NUTONE LLC,

        Defendant

*************************************************


DEPOSITION OF MELISSA VIERA

Friday, December 8, 2006, 11:00 a.m.

Little Medeiros Kinder Bulman & Whitney

72 Pine Street, 5th Floor

Providence, Rhode Island

---- Reporter:  Christine Silva-Adermann, RPR ----

www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Suite 415

Boston, Massachusetts 02109

617.728.4404    Fax 617.728.4403

38

1   on the second floor sometime just prior to lunch.

2   She took lunch around 12:30 p.m.  She did use the

3   light and she believes she shut it off.  Melissa

4   stated that she was in the ladies' room between

5   10:30 and 11:00."  He says 10:30 and 11:00 p.m.  Did

6   you work the night before until 10:30 and 11:00?

7       A.   We're not open nights.

8       Q.   Let's assume for a moment that he meant

9   a.m.  "She was sure that she shut off the light at

10  that time.  She reiterated that the timer would not

11  work and she would have to manually turn it off.

12  She does not know if someone else went into the

13  bathroom after her."  Ask you if I read that

14  properly?

15      A.   Yes.

16      Q.   Does that refresh your memory as to whether

17  or not you used the bathroom on the late morning of

18  December 15, 2003?

19      A.   I don't recall.  I mean, I might have used

20  the bathroom because of the thing, but I don't

21  recall giving that statement.

22      Q.   Okay.  Would it be fair to say that if I

23  had asked you these questions about what you did

24  that day back in December of 2003, your memory would

FARMER ARSENAULT BROCK LLC

39

1    be better about those?

2        A.    Right after the fire, I probably would have

3    remembered.

4        Q.    Okay.  Do you remember anything about the

5    ladies' room?

6                MR. PONSETTO:  Objection to form.  You

7    can go ahead and answer.

8        A.    What do you mean?

9        Q.    You remember there was a ladies' bathroom?

10       A.    Yes.

11       Q.    Was there one stall or two?

12       A.    One.

13       Q.    Was there any fixture overhead?

14       A.    There was a ceiling fan.  The light and the

15   fan put together.

16       Q.    So it had a light in it?

17       A.    Yes.

18       Q.    What controlled the light or the fan?

19       A.    The timer on the outside controlled both.

20       Q.    Were there two switches, one for the light

21   or one far the fan, or one switch?

22       A.    One switch.

23       Q.    Were there any other lights in the

24   bathroom?

FARMER ARSENAULT BROCK LLC

40

1      A.   No.

2      Q.   Was there a mirror over the sink?

3      A.   Yes.

4      Q.   Were there a set of lights over that

5   mirror?

6      A.   I don't recall.

7      Q.   Fair enough.  Do you remember how the

8   switch -- you said there was a timer switch; was

9   that right?

10      A.   Yes.

11      Q.   Do you remember how it worked?

12      A.   You would turn it, and it was five, ten

13   minutes.  And then when it should turn off and it

14   wouldn't turn off, it would just stick.  The light

15   and timer would turn off automatically, but it did

16   not.

17      Q.   You are going to have to explain that to

18   me.  You say there was a timer and it was some type

19   of knob?

20      A.   Yes.  This knob, you turn it, and it would

21   say minutes.  Then you go into the bathroom, you

22   come out, and it automatically shut off on its own.

23   It wasn't automatically turning off.  You had to do

24   it yourself.

41

1   Q.   So how would you turn it -- you illustrated

2   with your hand to turn the fan and the light both

3   on, you would have to turn the switch clockwise?

4   A.   To the right, yeah.

5   Q.   Did you have to punch it in, push it in to

6   get something to start?

7   A.   I do believe you pushed it and turned it.

8   Q.   Do you remember?

9   A.   I don't know now.

10  Q.   Okay.  You said it was supposed to be such

11  that you would set it to a particular time in

12  minutes?

13  A.   Yes.

14  Q.   And then it would, the way it was supposed

15  to work it would automatically count down itself and

16  then shut off the fixture?

17  A.   Yes.

18  Q.   That apparently was not working properly as

19  of the date of the fire?

20       MR. PONSETTO:  Objection to form.

21  A.   Yes.

22  Q.   Am I correct?

23  A.   Yes.

24  Q.   You said you would have to turn it off

FARMER ARSENAULT BROCK LLC

42

1   manually?

2        A.   Yeah.

3        Q.   How would you do that?

4        A.   I would just turn it to the left to turn it

5   off.

6        Q.   You'd have to rotate it back

7   counterclockwise?

8        A.   Yes.

9        Q.   To get it to turn off?

10       A.   Yes.

11       Q.   Did you have to punch it to get it to turn

12  off?

13       A.   No.

14       Q.   Who installed that switch?

15       A.   I do not know.

16       Q.   Had you reported the fact that it was not

17  working properly to anybody else?

18       A.   Yes.

19       Q.   To whom?

20       A.   I told Wayne Johnson.

21       Q.   When did you tell Mr. Johnson?

22       A.   I think it was a day or two because it was

23  only broken for like a day or two.  I think we told

24  him when it was not working properly.

1     Q.   What did Mr. Johnson say to you?

2     A.   He said okay.  Then that was it.

3     Q.   Did Mr. Johnson say we'll get someone to

4  fix it?

5     A.   Not to my knowledge.  I can't recall.

6     Q.   Do you know if Mr. Johnson did anything to

7  fix it?

8     A.   I don't know.

9     Q.   Or if he hired anybody to fix it?

10    A.   I don't know.

11    Q.   In the chain of command at Colonial Candle,

12  in the ordinary course of business to whom would

13  Mr. Johnson report issues like that to get them

14  repaired?

15    A.   I don't know.

16    Q.   Between the time that you reported, the day

17  or two prior to the fire that you reported that the

18  switch was not working and the time of the fire, did

19  you ever see anybody in there trying to fix it?

20    A.   No.

21         MR. DUGGAN:  Let me, if I might, I'll

22  mark this as the next exhibit.

23         (Marked, Exhibit 3, Report from EFI.)

24    Q.   I'm going to show you, Ms. Viera, a

44

1    document we marked as Exhibit 3.  You see it's

2    entitled EFI, and it has two photographs on it.

3                    MR. PONSETTO:  Do you agree with that?

4                    THE WITNESS:  Yes.

5        Q.   Do you recognize what's shown in that

6    picture?

7        A.   It's a timer switch.

8        Q.   Is that the timer switch that was in the

9    ladies' room on the day of the fire?

10       A.   I don't recall what it looked like,

11   honestly.

12       Q.   I take it you would have recalled that if I

13   asked you three years ago?

14       A.   Yeah.  I know it was similar to that, but I

15   can't recall exactly.

16       Q.   Can you remember what the maximum amount

17   was that you could leave it on before it counted

18   down?

19       A.   No, I don't remember that.

20       Q.   You said there was a light as well as a

21   fan?

22       A.   Mm-mm.

23       Q.   Correct, in the ceiling?

24       A.   Yes.

FARMER ARSENAULT BROCK LLC

G

Volume: 1
Pages:  1 to 183
Exhibits:  A to R


UNITED STATES DISTRICT COURT
COMMONWEALTH OF MASSACHUSETTS
C.A. No. 05-11401-MLW


SENECA INSURANCE COMPANY, As     )
Subrogee of Surfside Condominium )
                    Plaintiff    )
                                 )
     vs.                         )
                                 )
BROAN-NUTONE LLC,                )
                    Defendant    )


          **DEPOSITION of WALTER W. BECKER,**
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Federal Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Law Offices of
Field & Schultz, 183 State Street,
Boston, Massachusetts 02109, on Friday,
September 22, 2006, commencing at
12:00 p.m.

APPEARANCES: (Continued on page 2)



* * * *


SIDEL COURT REPORTING SERVICES
Certified Shorthand Reporters
35 Tudor Road
Needham, Massachusetts 02492

patterns in the kitchen that was near the

bathroom.

A.  I believe --

        MR. PAPADOPOULOS:  Objection.

A.  I believe they shared a common wall

between the two of them.

Q.  What were the burn patterns that you saw

in the kitchen that shared a common wall

with the bathroom?

        MR. PAPADOPOULOS:  Objection.

A.  To the best I can remember, it was in the

ceiling.  Some of the fire had, instead

of -- you know, went out towards the

kitchen area.

Q.  Did you take any photographs while you

were there?

A.  No.

Q.  Did you take any videotapes while you

were there?

A.  No.

Q.  Did you make any effort to preserve

photographically, graphically, or in any

other way the fire scene while you were

there?

A.   No.

Q.   Did you see if Mr. Boyd made any effort
     to preserve the fire scene?

A.   I didn't see anything, no.

Q.   Was Broan-Nutone represented at that
     inspection that you were on?

A.   No.

Q.   Where was the ceiling fan at the time
     when you were there in January of 2004?

A.   I believe it was still in the ceiling.

Q.   Did you go into the other bathroom?  You
     said there were two bathrooms.

A.   I don't recall.

Q.   Now, did you notice if there were any
     wires in the ceiling that were leading to
     or from the ceiling fan in the bathroom?

A.   No, I don't recall seeing any.

Q.   It would be fair a statement, I take it,
     that you didn't trace any of the wires?

A.   No, that's correct.

Q.   Did you know if anybody did on behalf of
     Mr. Vigeant?

A.   I don't know.

Q.   Or Mr. Vigeant's insurance company?

testimony earlier today, sir, you
mentioned that around December 2nd
you wrote a letter to the owner, Mr.
Vigeant, telling him of your corporate
determination to terminate the lease, and
basically was part of a reorganization of
the company, right?

A.   Right.

Q.   And on December 12th, if I remember
correctly, in one of these other exhibits
he wrote back to you acknowledging your
letter, and saying he still believes the
lease is in force and in effect?

A.   Yes.

Q.   But at that time you had made him aware
of the fact that as of January 31, 2004,
Candle Corporation of America would be
vacating the premises.  I think that's
what the documents state.  You can look
at it if you want.  Exhibit D, I believe,
December 2nd, 2003, from this one here,
sir.

A.   Yeah, I have my copy.

                MR. PONSETTO:  What's the

Blyth, Inc.
1 East Weaver Street
Greenwich, CT 06831-5118

Tel (203) 661-1926
Fax (203) 661-1969
www.blythinc.com

**VIA OVERNIGHT MAIL**

December 2, 2003

# BLYTH

Mr. Richard Vigeant
1022 Main Street
West Barnstable, MA 02668

RE:  *Candle Corporation of America*
     *585 Main Street, Yarmouth, MA*

Dear Mr. Vigeant:

As a follow-up to our phone conversation, please accept this letter as our formal notice to terminate the lease and vacate the above-referenced premises, effective January 31, 2004.

Our decision to terminate the lease was based solely on a change in business strategy and not on any dissatisfaction with the premises.

I will be calling you by the end of this week to discuss the remaining lease obligation and procedure for vacating the premises.

Sincerely,

*Walter W. Becker*

Walter W. Becker
Senior Manager

WWB/bn



Vigeant 12-2-03

CCA 00003

**H**



# Whalen Restoration Services Inc.

Fire, Smoke, Soot, Water Damage & Mold Remediation Services
Cleaning • Deodorization • Reconstruction

## Specializing in Fire Restoration - All Work Guaranteed

## Access, Authorization and Direct Payment Request Form

I (we) authorize **WHALEN RESTORATION SERVICES** to perform work _as per estimate_
at property located at __585 Main Street, West Yarmouth, MA 02673__
to repair damage caused by __fire__ _____ _____ on __12/15/03__

As owner(s) of this property, I (we) understand that I (we) must authorize this work. I (we) hereby
authorize **WHALEN RESTORATION SERVICES** to perform this work and accept responsibility for
payment upon completion.

I (we) authorize and direct my Insurance Company __Seneca Claim #3LLN065__
Policy No.__CMP2001017_____ _____, to make payments directly to **WHALEN RESTORATION
SERVICES**, Insurance Claim Specialists, for doing this work and to that extent I (we) assign the benefits
applicable to this loss to **WHALEN RESTORATION SERVICES**.

I (we) acknowledge receipt of a copy hereof:

__12-15-03__
DATED

OWNER __Richard C. Viganti__
SIGNED

WHALEN RESTORATION REP.

OWNER _____
SIGNED

22 American Way, South Dennis, MA 02660
Phone: (508) 760-1911 • Fax: (508) 760-9995 • 1-800-244-2598 • E-Mail: restore@whalenrestorations.com
Web Page: http://www.whalenrestorations.com

**OFFICE COPY**

# EMERGENCY AREA RUG SHEET

JOB #2

JobName(owner): Dick                    Tenant:
Address: 589 Rte 28                      Contact :

Home Phone:(   )              cellPhone
Work Phone:(   )              Loss Type: water

**Crew Labor – Emergency Service:**                    3:30              6:20

Date: 12-17-03   Name: Mike        In: ___ AM/PM   Out: ___ AM/PM
Date:    "       Name: Ron         In: ___ AM/PM   Out: ___ AM/PM
Date:    "       Name: John        In: ___ AM/PM   Out: ___ AM/PM
Date:    "       Name: Joe         In: ___ AM/PM   Out: ___ AM/PM

**TOTAL # OF AREA RUGS:** _____        **CLEANED BY/
                                                 DATE**

Type:_____   Size:_____   Room:_____   _____
Type:_____   Size:_____   Room:_____   _____
Type:_____   Size:_____   Room:_____   _____
Type:_____   Size:_____   Room:_____   _____
Type:_____   Size:_____   Room:_____   _____
Type:_____   Size:_____   Room:_____   _____
Type:_____   Size:_____   Room:_____   _____
Type:_____   Size:_____   Room:_____   _____
Type:_____   Size:_____   Room:_____   _____
Type:_____   Size:_____   Room:_____   _____
Type:_____   Size:_____   Room:_____   _____
Type:_____   Size:_____   Room:_____   _____
Type:_____   Size:_____   Room:_____   _____
Type:_____   Size:_____   Room:_____   _____

**Notes & Observations:**

Ice + Water    Shield    5 Rolls

1/2"  Plywood    10 Sheets

8'   Strapping    2 Bndls.

RESTAREARUG.doc 2/29/00

# EMERGENCY JOB SHEET

JobName(owner): *Colonia Garden*                     Tenant:
Address:

Home Phone:(   )                   Phone (   )
Work Phone:(   )                           Loss Type:

**Crew Labor – Emergency Service:**
Date: 12-15-03 Name: *Glenn M*_____ In: 4:00 AM/PM Out: 7:00 AM/PM
Date:   "   Name: *Jamie*_____ In: 4:00 AM/PM Out: 7:00 AM/PM
Date:   "   Name: *Wilson*_____ In: 4:00 AM/PM Out: 7:00 AM/PM
Date:_____ Name:_____ In:_____ AM/PM Out:_____ AM/PM

**Equipment Left on Site:**
Air Movers:_____ Dehumidifiers:_____ Ozone:_____
Delivered:_____ Picked Up:_____
Was Laundry picked up? Yes_____ No_____      # of Bags:_____
Is Debris to be removed? Yes_____ No_____
Is Estimator Required:  Yes_____ No_____

**Rooms (please note if extracted, removed carpet or if Micro-banned):**

| Room | Size | Services |
|---|---|---|
| 8' x 20 6" | | |
| 3Hrs Room | 10' x 2 x 16" | Water Extraction Placed |
| Front Office | 16' 6" x 64" | Remove Home Products, Controlling, Tear out Carpet |
| Bonea Room | 14'2" x 5'4" | Lift Rug, Remove Home Products |
| Hall | 5 x 14 | 4'x0' 4'x15'5 |
| W B | 8' x 6'6" | |
| W B | " | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Notes & Observations:**

I

**SENECA**    160 WATER STREET • NY, NY 100__

<<<< 
PAY
TO THE
ORDER OF

SURFSIDE CONDOMINIUM ASSOCIATION ZION FIRST NATIONAL BANK
R.E.,ROCKLAND TRUST ISAOA & WHALEN RESTORA

TION SERVICES,INC

FOR    RESTORATION WORK

**PAY**    $19,755.68

**DOLLARS**

NINETEEN THOUSAND SEVEN HUNDRED FIFTY-FIVE DOLLARS AND SIXTY-EIGHT CENTS

| POLICY NUMBER | CLMT. | DATE C |
|---|---|---|
| CMP2001017 | 01 | 12/ |

DATE ISSUED    8/12/04

INSURED/CLAIMANT

SURFSIDE CONDO
SURFSIDE CONDO

SENECA INSURANCE COMPANY, INC.
NOT VALID AFTER 90 DAYS
TWO SIGNATURES REQUIRED OVER $2500

**NON-NEGOTIABLE**

AUTHORIZED SIGNATURE

CLAIM #    03LLR065
THE BANK OF NEW YORK
NEW YORK, N.Y.   10286

⑈180122⑈ ⑆021000018⑆ ⑈8900153830⑈

180122    ☐ FP  ☐ SUP  ☐ PP

AGENT:    XS BROKERS INS. AGENCY INC.
POB 690355
1563 HANCOCK ST
QUINCY        MA 02269

**SENECA**
INSURANCE COMPANY, INC.

8/03

MAIL TO:    LUCIER CLAIM SERVICE
P.O. BOX 631
EAST BRIDGEWATER    MA 02333

CLAIM FILE COPY    THE ATTACHED CHECK IS IN PAYMENT OF THE LOSS EXPENSE SH

WINS ENTRY

AUG 12

L. HASKINS

FOR: _____

MAIL TO: _____

**WINS ENTRY**

AUG 12 2004

L. HASKINS

# SWORN STATEMENT IN PROOF OF LOSS

## (For Use With Replacement Cost Coverages)

| | | |
|---|---|---|
| $936,000 | | CMP2001017 |
| AMOUNT OF POLICY AT TIME OF LOSS | | POLICY NUMBER |
| 7/15/2003 | | |
| DATE ISSUED | | AGENT |
| 7/15/2004 | | Arlington, MA |
| DATE EXPIRES | | AGENCY AT |

To the    Seneca Insurance Company

of    New York, NY

At time of loss, by the above indicated policy of Insurance you insured    Surfside Condominium

against loss by    All Perils    to the property described under Schedule "A", according to the terms

and conditions of the said policy and all forms, endorsements, transfers and assignments attached thereto.

**1. Time and Origin:**    A __Fire__ loss occurred about the hour of _____ o'clock __.M.,

on the 15th day of December 2003. The cause and origin of the said loss were:

Final payment for cleaning and emergency services

**2. Occupancy:**    The building described, or containing the property described, was occupied at the time of the loss as

follows, and for no other purpose whatever:    Commercial

**3. Title and Insurance:**    At the time of the loss the interest of your insured in the property described therein was

Owner    . No other person or persons had any interest therein

or incumbrance thereon, except:    Zion First Nation Bank R.E., Rockland Trust

**4. Changes:**    Since the said policy was issued there has been no assignment thereof, or change of interest, use,

occupancy, possession, location or exposure of the property described except:    None Known

**5. Total Insurance:**    The total amount of insurance upon the property described by this policy was, at the time of the loss,

$936,000    , as more particularly specified in the apportionment attached under Schedule "C," besides which

there was no policy or other contract of insurance, written or oral, valid or invalid.

| | | | |
|---|---|---|---|
| 6. Full Replacement Cost of the said property at the time of loss was ......................... | $ | Undetermined | |
| 7. The Full Cost of Repair or Replacement is .......................................................... | $ | | 19,755.68 |
| 8. Applicable Depreciation or Betterment is ........................................................... | | | |
| 9. Actual Cash Value Loss is (Line 7 minus Line 8) .................................................. | $ | | 19,755.68 |
| 10. Less deductibles and/or participation by the insured of | | | |
| 11. Actual Cash Value Claim is (Line 9 minus Line 10) .............................................. | $ | | 19,755.68 |

**12. Supplemental Claim,** to be filed in accordance with the terms and conditions of the

Replacement Cost Coverage within ___N/A___ days from the date of loss as shown above, will not

exceed ....................................................................................................    $    -

(This figure will be that portion of the amounts shown on Lines 8 and 10 which is recoverable.)

   The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

   The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights.

State of    MASSACHUSETTS      X _____

County of    BARNSTABLE      X _____

                                                         The Insured

Subscribed and sworn to before me this _26_ day of _August_ 2004

X _____ Witness

**J**

# Industrial Services & Engineering, Inc.
15 Extension Street, Attleboro MA 02703 (508) 226-8800 FAX (508) 226-8880



## ISE "QUICK FAX REPORT"
## PLEASE HAND DELIVER ASAP

To:     Mr. Wayne Levasseur
        Lucier Claim Service
        P.O. Box 631
        East Bridgewater, MA

*ATTN*
*Donna Moore*

From:   Industrial Services & Engineering

Subject: Exhaust Fan Fire at:
        The Surfside Condominium Property
        585 Main Street
        West Yarmouth, MA
        ISE TASK No. 04F015
        Policy No. CMP2001017
        Claim No. 3LLNO65 (File No. 12150301W)
        Inspected By: Tom Zarek CFEI

Dear Mr. Levasseur

Thank You for allowing **Industrial Services & Engineering** (ISE) the opportunity to provide technical services to **Lucier Claim Service**. This is a quick summary of our findings at the above referenced inspection location.

ISE's inspections are conducted by tradesmen who are following an Inspection Protocol under the direction of ISE's Director of Engineering, John P. Certuse, P.E.

A full report will be mailed pending photo processing and any additional information needed.

### Findings: 2 August 2004

Our inspection found the unit to be a Broan-Nutone Exhaust Fan. The model number of the unit appears to be 657, serial number N/A. The unit was built in 1997.

### The most significant findings of our inspection are the following:

1) ISE was asked to examine two ceiling exhaust fans recovered from this loss location. Reportedly the fan installed within the ladies bathroom had caught on fire and caused damage to the loss location.

The original site cause and origin examination was preformed by Jeff Lowe (CFI, CFEI) from EFI. During that examination Mr. Lowe had determined that the origin of the fire was in the second floor

ladies room of this building. Reportedly also, the second floor along with bathrooms was installed in 1997 when Cape Cod Candles began to occupy the location.

Reportedly also, when Mr. Lowe arrived at the loss location, the ceiling fans had already been pulled down, and as the such the evidence tags were labeled with the probably location. The fans were acquired from the loss location and transported to ISE's facilities by Wane Lavasseur.

ISE did not examine the loss location, to confirm the origin of the fire or the location of the ceiling fans. However, the fan labeled "probable men's room" contained ceiling members and an absence of fire damage to those members, and thus was likely correctly labeled.

2) Examination of the two fans found that these were of a different design, with potentially different manufacturers. The fan identified as being installed in the men's room was found to have been sold under the Nutone trade name with model number 8664RP. The item did have fire damage, but as previously noted, contained structural or mounting members that possessed no evidence of fire damage.

The second unit, reported to have been installed within the ladies bathroom, was found to be what appears to be a Broan-Nutone model 657 combination exhaust fan and light.

Heat and fire patterns noted on the inside and exterior of the unit indicates that this was exposed to extensive fire damage. Heat damage was noted on both the inside and outside of the appliance, with patterns indicating a migration of a fire from within the unit, through the exhaust fan and out of the exhaust duct. Examination of the lighting reflector, found little evidence of exposure on the face of the reflector, but with evidence of soot and heating on the top side of the reflector in an area closest to the dual receptacles.

3) In this area, two receptacles slots were noted. However, one receptacle was observed to be missing. The second was noted to be in place, and appears to be a male receptacle. This appears to be the connection between the exhaust fan and supply power.

The retaining screw was removed from the fan motor mounting, and an examination of the wire tray was undertaken. Examination within this area, found supply wiring with evidence of electrical arcing as evidenced by balling of wire ends, and one wire observed to have electrically arced to the appliance chassis. Insulation was noted to be missing from all wires within this area, indicating fire exposure. The evidence of electrical arcing noted indicates that the wires were energized at the time of the fire, and were electrically arced to the chassis once the insulation was consumed and the wires were exposed.

The remnants of the female power receptacle for the light was found within this area, with the "hot" connection noted to be missing. Specifically, the hot connection was observed to be separated from the receptacle housing suggesting that this area suffered the greatest amount of heat damage. In comparison, the electrical receptacle for the exhaust fan motor possess significantly less damage than the light receptacle.

4) Further examination within this area, found the supply connection to be attached to the supply wiring and to be located within the wire trace area. Evidence of electrical arcing on the connection end was not noted.

Examination of the motor, found this to have been heavily damaged due to exposure to fire. The plastic blower wheel was entirely consumed, along with both aluminum motor bearing caps. Motor

2

wiring was observed to be heavily burned with all insulation missing. Fire and heat patterns noted indicate that the fire appeared to be traveling through this area, potentially due to being ingested by the exhaust fan prior to melting of the plastic exhaust fan, and the damage to the motor.

## Our initial conclusion of this inspection is the following:

The origin of the fire within this appliance appears to be within the supply wiring to the light. Specifically, the damage to the female receptacle suggests that the supply connection (hot side) overheated causing localized heating as is consistent with a high resistance or poor connection between the light and the supply wiring. Where insufficient surface area occurs between two connections, the flow of electrical current between the supply power and the object being powered causes heating at the connection.

The appliance appears to have been installed in 1997, and potentially over that time period, lint has accumulated within the housing. This lint also accumulates on the blower wheel and can cause an unbalanced condition, resulting in vibration and causing connections to separate.

We did note, that the receptacle provided to the fan was manufactured in such a way, with serrated edges that appears to have been an attempt to prevent that connection from loosening. We did not note this on the light connections.

The appliance was manufactured by Broan –Nutone. The source of the fire within this device appears to be due to a connection failure between the light and supply wiring that came loose over the period of use, and caused a high resistance connection, localized heating and the ensuing fire.

Examination of the second exhaust fan although it did possess fire indications, it appears to have been within a fire and not the source of the fire. We did note that the fan is of a different design, even though it was installed during the 1997 construction activities. This suggests, that it may have been recently replaced.

Should you wish to contact the manufacturer, this appliance was manufactured by Broan-Nutone who is located at:

Broan-NuTone, LLC
PO Box 140
Hartford, WI 53027
(800) 558-1711

**Please note that a full written report will be sent upon photo processing and required additional information gathering.**

Sincerely

Thomas F. Zarek CFEI
Inspector ISE

K

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

C.A. NUMBER: 05-11401-MLW

SENECA INSURANCE COMPANY
As Subrogee of Surfside Condominium
Association,

        Plaintiff,

v.

BROAN-NUTONE LLC,

        Defendant.

## INTERROGATORIES OF BROAN-NUTONE LLC TO PLAINTIFF SENECA INSURANCE COMPANY

1.    Set forth your name, business address, residential address, and position you hold with Seneca Insurance Company.

2.    Identify by name and address the owner of Surfside Condominium Association, 585 Main Street, West Yarmouth, MA ("Surfside").

3.    Identify each person whom Seneca Insurance Company ("Seneca") expects to call as an expert witness at trial.  For each, state:

    A.    the subject matter on which the expert is expected to testify;

    B.    the substance of the facts and opinions to which the expert is expected to testify; and

    C.    a summary of the grounds for each opinion.

4.    Please describe fully:

    A.    How Seneca claims the fire described in the Plaintiff's Complaint began;

    B.      Every fact, act and document which supports Seneca's theory of the cause of the fire; and

    C.      Any alternative cause investigated or considered by Seneca.


5.      With regard to the ceiling/exhaust fan alleged to have been involved in the fire, please state:

    A.      The name and address of the seller or retailer from whom the fan was purchased;

    B.      When it was purchased and by whom;

    C.      A description of all documents or other written material supplied with the fan when purchased;

    D.      The name and address of each and every individual who installed the fan;

    E.      The name of the company or business for whom the installers worked;

    F.      Whether you know if the fan had been changed, repaired, or otherwise altered at any time from the date of purchase until the fire, and,

            (i)      If your answer is "yes" to interrogatory 5F, please give a complete description of any and all changes, alterations or repairs; or

            (ii)     If your answer to interrogatory 5F is "no" please describe fully all facts upon which you base that answer.


6.      Please describe fully all facts, acts, documents and reasons upon which Seneca relied in making the allegations in the Plaintiff's Complaint that:

    A.      The fire started in or near the ceiling/exhaust fan; and

    B.      the ceiling/exhaust fan was the direct and proximate cause of the fire.


7.      Please give the following dates:

    A.      When the owners of Surfside and the property on which it is located learned about the fire;

    B.      When Seneca learned about the fire;

C.    When Seneca learned the cause of the fire was a ceiling/exhaust fan.

D.    The date that anyone at Seneca gave notice of the fire to Broan-NuTone, along with a description of how that notice was given and by whom;

8.    With respect to any material or debris removed from Surfside and its premises, please state:

A.    The name and address of the company and/or people responsible for removal;

B.    A full description of what was removed and when;

C.    All instructions given by Surfside, the property owners or Seneca as to the preservation of the material removed;

D.    The name and address of the person or company in custody or possession of any fire debris as of the date of answering these interrogatories and a description of all debris that is being held and preserved.

9.    Identify by name and address each and every person who inspected or was present at the fire scene within 14 days of July 15, 2003.

10.    With regard to the allegations in the Plaintiff's Complaint, please state:

A.    A complete description of how Seneca claims that Broan-NuTone was negligent;

B.    Precisely how the negligence you allege was the proximate cause of the fire;

C.    All facts, acts and documents upon which Seneca relies in the allegations in the Plaintiff's Complaint that Broan-NuTone negligently designed the ceiling/exhaust fan that was involved in the fire.

D.    Any feasible alternative design available to Broan-NuTone at the time of the manufacture of the ceiling/exhaust fan that would have avoided the fire in July 2003.

E.    All facts, acts and documents upon which Seneca relies in the allegation in the Plaintiff's Complaint that Broan-NuTone failed to properly manufacture the ceiling/exhaust fan;

3

F. Provide a list of the component parts that you claim were negligently manufactured and describe in complete detail the reasons for your conclusion that each component part you list was improperly manufactured;

G. All facts, acts and documents upon which Seneca relies in the allegation in the Plaintiff's Complaint that Broan-NuTone was negligent by placing into the stream of commerce a product that Broan-NuTone knew, or with reasonable care, should have known, was unreasonably dangerous; set forth specifically why Seneca contends the product was unreasonably dangerous; and state specifically which facts were available to Broan-NuTone when the product was sold that the product was unreasonably dangerous and unsafe;

H. All facts, acts and documents upon which Seneca relies in the allegation in its complaint that Broan-NuTone was negligent by failing to warn consumers that the ceiling/exhaust fan was unreasonably dangerous, including in your answer

(i) the warning that you claim would have been sufficient; and

(ii) how you claim the lack of the warning was related to the fire.

11. With respect to the allegations raised the Plaintiff's Complaint, please set forth in full and complete detail all facts, acts and documents upon which Seneca relies in making these allegations:

A. Broan-NuTone breached its warranties because the product was unsafe, not of merchantable quality and unfit for its intended uses and purposes; and

B. Due notice was given to Broan-NuTone of its breaches of warranty.

12. Please itemize in full and complete detail all damages allegedly sustained by Seneca and its insureds as a result of the fire.

13. Please itemize all monies received from any source as a result of the fire by

A. Surfside;
B. Seneca;
C. Colonial Candle Company; or
D. Dick Regent.

14. Identify by name and address all witnesses Seneca may call at trial.

4

15.    Identify all documents, diagrams, sketches, chalks, videotapes, real evidence or other evidence that Seneca may introduce at trial.


16.    Identify by name and address the persons or entities responsible for maintenance at Surfside or its premises from 1998 to the present.


17.    Identify by name, date and author each and every report possessed by Seneca relating to the fire.  In lieu of a written response, you may attach a copy of each report to your answers.


                                        Respectfully Submitted,
                                        BROAN-NUTONE LLC,
                                        By its attorneys,



                                        Christopher A. Duggan
                                        BBO No. 544150
                                        Tamara Lee Ricciardone
                                        BBO No. 562203
                                        SMITH & DUGGAN LLP
                                        Lincoln North
                                        55 Old Bedford Road
                                        Lincoln, MA 01773
                                        (617) 228-4400

Dated:  December 16, 2005

## CERTIFICATE OF SERVICE

I hereby certify that on this day I served by first class mail, postage prepaid, the documents listed below upon all parties as set forth below on this, the 16th day of December, 2005.

Document Served:

INTERROGATORIES OF BROAN-NUTONE LLC TO PLAINTIFF SENECA INSURANCE COMPANY

Served:
Michael S. Field, Esq.
Field & Schultz
183 State Street
Boston, MA 02109

Christopher A. Duggan
BBO No. 544150

L

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

C.A. NUMBER:  05-11401-MLW

---

SENECA INSURANCE COMPANY
As Subrogee of Surfside Condominium
Association,

        Plaintiff,

v.

BROAN-NUTONE LLC,

        Defendant.

---

### NOTICE OF DEPOSITION:  SENECA INSURANCE COMPANY, BY AND THROUGH GREG POLSKY, SUBROGATION COLLECTIONS MANAGER

TO:    Michael S. Field, Esq.
       Field & Schultz
       183 State Street
       Boston, MA 02109

     PLEASE TAKE NOTICE THAT, pursuant to Fed. R. Civ. P. 30(b)(6) and 45, defendant Broan-NuTone LLC, through its attorney, will take the deposition upon oral examination of Seneca Insurance Company, by and through Greg Polsky, Subrogation Collections Manager at **10:00 a.m. on Tuesday, February 21, 2006,** at the law offices of Smith & Duggan LLP, Lincoln North, 55 Old Bedford Road, Lincoln, MA 01773.  The deposition shall be taken before an officer authorized to administer oaths, and shall continue from day to day until completed.

     The witness is further required to bring the items set forth on the attached Schedule A.

     If more than one person must be designated and produced by Colonial Candle to comply with this request, each shall be deposed in succession.

You are invited to attend and cross-examine.

Broan-NuTone LLC,
by its attorneys,

Christopher A. Duggan (BBO No. 544150)
Tamara Lee Ricciardone (BBO No. 562203)
SMITH & DUGGAN LLP
Lincoln North
55 Old Bedford Road
Lincoln, MA 01773
(617) 228-4400

## SCHEDULE A

1.  All documents relating to the fire that occurred on December 15, 2003 at Surfside Condominium Association and/or Colonial Candle at 585 Main Street, West Yarmouth, MA (the "fire").

2.  All records or documents relating to any investigation into The Fire conducted by Seneca, it investigators or its insureds.

3.  All photographs, videotapes, diagrams, sketches or other depictions of:
    A.   Any product, debris or other material present at the fire scene;
    B.   Any product, debris or other material removed from the fire scene.

4.  All records and documents that relate to any potential cause of The Fire.

5.  All records relating to the installation and or maintenance of the fan/light units at 585 Main Street, West Yarmouth, MA  (the "premises").

6.  All documents reflecting any notice of The Fire given to Broan-NuTone LLC.

7.  All records relating to, reflecting or constituting any report by any expert as to:
    A.   The cause of the Fire;
    B.   The design of the fan/light units;
    C.   Plaintiff's allegation that the fan/light units caused a fire;
    D.   Any proposed alternative design of the fan/light units.

8.  Any report or document of any fire department, fire marshal or other public entity or agency relating to:
    A.   The Fire;
    B.   The fan/light units;
    C.   The potential cause of The Fire.

9.  Any drawings, plans or blueprints reflecting:
    A.   The layout of the premises at 585 Main Street, West Yarmouth, MA;
    B.   The construction of the premises at 585 Main Street, West Yarmouth, MA;
    C.   Wiring of the fan/light units;
    D.   Instructions and/or warnings relating to the use of the fan/light units.

10. All documents relating to or reflecting any damages claimed in this matter by Colonial Candle, Surfside Condominium Association, Dick Vigeant or Seneca.

11. All documents submitted to plaintiff by each of its insureds in support of the claims they submitted to plaintiff arising out of the Fire on which this suit is based.

12. All statements taken of plaintiff's insureds as part of the claims handling process that resulted in plaintiff making payments to its insureds arising out of the Fire on which this suit is based.

13. All correspondence to and from the plaintiff (or its attorneys) and its insureds (or their attorneys) relating to the Fire on which this suit is based, the claims of plaintiff's insureds or the decisions made by plaintiff relative to those claims. This request specifically excludes documents that are protected by attorney client privilege and the work product doctrines.

14. Originals or copies of all bills, invoices, estimates or statements, paid or unpaid, by any person or entity on account of the damages and expenses allegedly sustained or incurred as a result of The Fire.

15. All statements taken from anyone who was or claims to be a witness to the Fire or the events surrounding it.

16. Any and all statements, signed or unsigned, written or recorded, which were taken from or given by you and/or any agent, servant or employee of Seneca concerning the events as alleged in Plaintiff's Complaint.

17. Any and all correspondence between plaintiff and defendant, or any agent, servant or employee thereof, evidencing, concerning, or relating to the events as alleged in the Plaintiff's Complaint or any claim for damages that allegedly occurred on or around December 15, 2003.

18. Any and all correspondence between plaintiff and any entity or individual evidencing, concerning, or relating to the events as alleged in Plaintiff's Complaint or any claim for damages which allegedly occurred on or around December 15, 2003.

19. Any and all documents relating to any claim that the injuries and/or damages complained of in the Plaintiff's Complaint were caused by the negligence of any person or entity.

20. Any and all documents relating to any claim that the injuries and/or damages complained of in the Plaintiff's Complaint were caused by any breach of warranty of any person or entity.

21. Any and all written or other documentary evidence which tends to show that the conduct, by act or omission, of some third person or persons, caused or contributed to the incident which forms the subject matter of this Complaint

4

including, but not limited to, any and all letters, complaints, pleadings, notices or other documents which refer to or reflect claims by the plaintiff against anyone other than the defendant identified in this litigation for compensation or damages as a result of the Fire.

22.    The original or copy of the full and complete policy or policies of insurance, including declarations page, application, riders and endorsements, which may provide coverage for liabilities which may be incurred as a result of this lawsuit or have provided coverage to the plaintiff's subrogor.

23.    All photographs, videotapes, sketches, diagrams, tables or drawings that relate in any way to the allegations of the Plaintiff's Complaint.

24.    Any and all police, fire, or other governmental agency reports pertaining to the Fire.

25.    Any and all reports submitted by experts whom the plaintiff intends to call at the trial of this action.

26.    Copies of the resume and curriculum vitae of each person whom the plaintiff expects to call as an expert witness at the trial of this action.

27.    Any and all documentary evidence that tends to exonerate or exculpate the defendant.

28.    Any and all photographs, documentary or tangible evidence that the plaintiff intends to offer into evidence at the trial of this action.

29.    All files, logs, memoranda, notes, work orders, correspondence or any other documents either maintained or received by any employee, manager or agent of the Surfside Condominium Association with respect to any electrical work performed by any party or entity at the Surfside Condominium Association from the time it was constructed to December 15, 2003.

30.    All files, logs, memoranda, notes, work orders, correspondence or any other documents either maintained or received by any employee, manager or agent of the Surfside Condominium Association that relate to Broan-NuTone LLC, its corporate predecessors, and any products manufactured by Broan-NuTone LLC.

31.    All reports, correspondence, claims materials or any other documents of any fire at the Surfside Condominium Association at any time.

32.    All reports from independent testing laboratories or any other organizations of tests performed on the Broan-NuTone fan/light units that plaintiff alleges caused the Fire.

## CERTIFICATE OF SERVICE

I hereby certify that on this day I served by first class mail, postage prepaid, the above document upon all parties as set forth below on this, the 13ᵗ day of January, 2006.

Served:

Michael S. Field, Esq.
Field & Schultz
183 State Street
Boston, MA 02109

Christopher A. Duggan
BBO No. 544150

6

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

C.A. NUMBER:  05-11401-MLW

SENECA INSURANCE COMPANY
As Subrogee of Surfside Condominium
Association,

            Plaintiff,

v.

BROAN-NUTONE LLC,

            Defendant.

RE-NOTICE OF DEPOSITION:  SENECA INSURANCE COMPANY, BY AND
THROUGH GREG POLSKY, SUBROGATION COLLECTIONS MANAGER

TO:   Michael S. Field, Esq.
      Field & Schultz
      183 State Street
      Boston, MA 02109

      PLEASE TAKE NOTICE THAT, pursuant to Fed. R. Civ. P. 30(b)(6) and 45,
defendant Broan-NuTone LLC, through its attorney, will take the deposition upon oral
examination of Seneca Insurance Company, by and through Greg Polsky, Subrogation
Collections Manager at **10:00 a.m. on Tuesday, August 29, 2006,** at the law offices of
Smith & Duggan LLP, Lincoln North, 55 Old Bedford Road, Lincoln, MA 01773.  The
deposition shall be taken before an officer authorized to administer oaths, and shall
continue from day to day until completed.

      The witness is further required to bring the items set forth on the attached
Schedule A.

      If more than one person must be designated and produced by Seneca Insurance to
comply with this request, each shall be deposed in succession.

You are invited to attend and cross-examine.

Broan-NuTone LLC,
by its attorneys,

Christopher A. Duggan (BBO No. 544150)
Tamara Lee Ricciardone (BBO No. 562203)
SMITH & DUGGAN LLP
Lincoln North
55 Old Bedford Road
Lincoln, MA 01773
(617) 228-4400

2

## SCHEDULE A

1.  All documents relating to the fire that occurred on December 15, 2003 at Surfside Condominium Association and/or Colonial Candle at 585 Main Street, West Yarmouth, MA (the "fire").

2.  Seneca's claim file relating to the fire and any subrogation efforts made on behalf of Seneca as a result of the fire.

3.  Any policies and procedures at Seneca relating to the handling of subrogation claims.

4.  Any policies and procedures at Seneca relating to the preservation of evidence at a fire scene.

5.  Any policies and procedures at Seneca relating to the investigation of fire losses.

6.  All records or documents relating to any investigation into The Fire conducted by Seneca, it investigators or its insureds.

7.  All photographs, videotapes, diagrams, sketches or other depictions of:
    A.  Any product, debris or other material present at the fire scene;
    B.  Any product, debris or other material removed from the fire scene.

8.  All records and documents that relate to any potential cause of The Fire.

9.  All records relating to the installation and or maintenance of the fan/light units at 585 Main Street, West Yarmouth, MA  (the "premises").

10.  All documents reflecting any notice of The Fire given to Broan-NuTone LLC.

11.  All records relating to, reflecting or constituting any report by any expert as to:
    A.  The cause of the Fire;
    B.  The design of the fan/light units;
    C.  Plaintiff's allegation that the fan/light units caused a fire;
    D.  Any proposed alternative design of the fan/light units.

12.  Any report or document of any fire department, fire marshal or other public entity or agency relating to:
    A.  The Fire;
    B.  The fan/light units;
    C.  The potential cause of The Fire.

3

13.    Any drawings, plans or blueprints reflecting:
  A.    The layout of the premises at 585 Main Street, West Yarmouth, MA;
  B.    The construction of the premises at 585 Main Street, West Yarmouth, MA;
  C.    Wiring of the fan/light units;
  D.    Instructions and/or warnings relating to the use of the fan/light units.

14.    All documents relating to or reflecting any damages claimed in this matter by Colonial Candle, Surfside Condominium Association, Dick Vigeant or Seneca.

15.    The original or copy of the full and complete policy or policies of insurance, including declarations page, application, riders and endorsements, which may provide coverage for liabilities which may be incurred as a result of this lawsuit.

## CERTIFICATE OF SERVICE

  I hereby certify that on this day I served by first class mail, postage prepaid, the above document upon all parties as set forth below on this, the _17_ day of August, 2006.

Served:

Michael S. Field, Esq.
Field & Schultz
183 State Street
Boston, MA 02109

            Christopher A. Duggan
            BBO No. 544150

4

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

C.A. NUMBER:  05-11401-MLW

SENECA INSURANCE COMPANY
As Subrogee of Surfside Condominium
Association,

    Plaintiff,

v.

BROAN-NUTONE LLC,

    Defendant.

RE-NOTICE OF DEPOSITION:  SENECA INSURANCE COMPANY, BY AND
THROUGH GREG POLSKY, SUBROGATION COLLECTIONS MANAGER

TO:  Michael S. Field, Esq.
   Field & Schultz
   183 State Street
   Boston, MA 02109

   PLEASE TAKE NOTICE THAT, pursuant to Fed. R. Civ. P. 30(b)(6) and 45, defendant Broan-NuTone LLC, through its attorney, will take the deposition upon oral examination of Seneca Insurance Company, by and through Greg Polsky, Subrogation Collections Manager at **10:00 a.m. on Wednesday, December 27, 2006,** at the law offices of Smith & Duggan LLP, 2 Center Plaza, Boston, MA 02108.  The deposition shall be taken before an officer authorized to administer oaths, and shall continue from day to day until completed.

   The witness is further required to bring the items set forth on the attached Schedule A.

   If more than one person must be designated and produced by Seneca Insurance to comply with this request, each shall be deposed in succession.

You are invited to attend and cross-examine.

Broan-NuTone LLC,
by its attorneys,

*Christopher A. Duggan*

Christopher A. Duggan (BBO No. 544150)
Tamara Lee Ricciardone (BBO No. 562203)
SMITH & DUGGAN LLP
Lincoln North
55 Old Bedford Road
Lincoln, MA 01773
(617) 228-4400

## SCHEDULE A

1.    All documents relating to the fire that occurred on December 15, 2003 at Surfside Condominium Association and/or Colonial Candle at 585 Main Street, West Yarmouth, MA (the "fire").

2.    Seneca's claim file relating to the fire and any subrogation efforts made on behalf of Seneca as a result of the fire.

3.    Any policies and procedures at Seneca relating to the handling of subrogation claims.

4.    Any policies and procedures at Seneca relating to the preservation of evidence at a fire scene.

5.    Any policies and procedures at Seneca relating to the investigation of fire losses.

6.    All records or documents relating to any investigation into The Fire conducted by Seneca, it investigators or its insureds.

7.    All photographs, videotapes, diagrams, sketches or other depictions of:
      A.    Any product, debris or other material present at the fire scene;
      B.    Any product, debris or other material removed from the fire scene.

8.    All records and documents that relate to any potential cause of The Fire.

9.    All records relating to the installation and or maintenance of the fan/light units at 585 Main Street, West Yarmouth, MA  (the "premises").

10.   All documents reflecting any notice of The Fire given to Broan-NuTone LLC.

11.   All records relating to, reflecting or constituting any report by any expert as to:
      A.    The cause of the Fire;
      B.    The design of the fan/light units;
      C.    Plaintiff's allegation that the fan/light units caused a fire;
      D.    Any proposed alternative design of the fan/light units.

12.   Any report or document of any fire department, fire marshal or other public entity or agency relating to:
      A.    The Fire;
      B.    The fan/light units;
      C.    The potential cause of The Fire.

13.    Any drawings, plans or blueprints reflecting:
    A.    The layout of the premises at 585 Main Street, West Yarmouth, MA;
    B.    The construction of the premises at 585 Main Street, West Yarmouth, MA;
    C.    Wiring of the fan/light units;
    D.    Instructions and/or warnings relating to the use of the fan/light units.

14.    All documents relating to or reflecting any damages claimed in this matter by Colonial Candle, Surfside Condominium Association, Dick Vigeant or Seneca.

15.    The original or copy of the full and complete policy or policies of insurance, including declarations page, application, riders and endorsements, which may provide coverage for liabilities which may be incurred as a result of this lawsuit.

## CERTIFICATE OF SERVICE

I hereby certify that on this day I served by first class mail, postage prepaid, the above document upon all parties as set forth below on this, the 18 day of December, 2006.

Served:

Michael S. Field, Esq.
Field & Schultz
183 State Street
Boston, MA 02109

Christopher A. Duggan
_____
Christopher A. Duggan
BBO No. 544150

4

M

TUESDAY, DECEMBER 16, 2003

# Candle shop fire blamed on fan

**By MARC PARRY**
STAFF WRITER



MATT SUESS

**Firefighters vent the roof of the Colonial Candle shop in West Yarmouth yesterday afternoon. The fire caused structural damage but no serious injuries.**

WEST YARMOUTH — Firefighters yesterday chain-sawed through the roof of a Route 28 candle shop to battle a blaze that began with a failed bathroom fan and ended with structural damage but no serious injuries.

The fire started just after 2 p.m. in the second-floor women's bathroom of Colonial Candle of Cape Cod, fire officials said, probably the result of an electrical short or motor failure in the ceiling fan.

Flames shot through a tube attached to the fan and mushroomed up through the rafters and insulation.

All employees and customers at Colonial Candle and Molly's Restaurant & Pub next door were evacuated.

One Colonial Candle worker was treated at the scene for smoke inhalation.

"It's hard," said Ann Mark, human resources manager for the candle chain, who rushed to the scene from Hyannis. "It's someone's livelihood. They probably won't be able to come back to work tomorrow."

The store will have to replace its ceilings and probably 60 percent of the wiring, Yarmouth Fire Captain Alan Bowles said.

He said the fire destroyed half of the second-story office area.

Bathroom fans have caused at least three fires in Yarmouth over the last two years, according to Deputy Fire Chief C. Randall Sherman.

In Hyannis, an unattended fan at the Cape Crossroads condominium complex in 2001 caused a fire that displaced 29 families.

Sherman said the fans posed no danger if used properly. But "like any small appliance" they can generate heat and short circuit if left on indefinitely, he said.

"Just turn them on, ventilate the bathroom while you have a shower or whatever, and turn them off when you leave," he said.

About 25 firefighters fought yesterday's blaze.

Some firefighters poured water on the fire from inside. Others ventilated the fire by gashing open the roof, tossing insulation and shingles down onto the parking lot below.

The strategy contained the fire to the second floor, which contains offices, storage and a meeting room.

The dozens of candle-filled crates in the store's first floor showroom escaped unscathed. The only disruption downstairs was a puddle of water on the blue rug.

**EXHIBIT**
5
Vigeant